UNITED STATES of America,
Plaintiff-Appellee,

v.

Ray VERA, Luis Romero,
Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Arturo POSADA, Defendant-Appellant.

Nos. 81–5148, 81–5184.

United States Court of Appeals,
Eleventh Circuit.

April 4, 1983.

Raymond J. Takiff, Coral Gables, Fla., Jerry W. Burford, Miami, Fla., for Romero.

Marc Cooper, Miami, Fla., for Vera.

Donald L. Ferguson, Miami, Fla., Steven Kirou, Coral Gables, Fla., for Posada.

Deborah Watson, Appellate Section Crim. Div., Dept. of Justice, Washington, D.C., for the U.S.

Before HILL and ANDERSON, Circuit Judges, and SCOTT *, District Judge.

CHARLES R. SCOTT, District Judge:

Following a jury trial in the United States District Court for the Southern District of Florida, appellants Arturo Posada, Luis Romero and Ray Vera were each convicted of conspiracy to distribute quaaludes in violation of 21 U.S.C. § 846, possession with intent to distribute quaaludes in violation of 21 U.S.C. § 841(a)(1) and distribu-

* Honorable Charles R. Scott, U.S. District Judge for the Middle District of Florida, sitting by designation.

tion of quaaludes in violation of 21 U.S.C. § 841(a)(1). In addition, appellant Romero was convicted of possession with intent to distribute hashish in violation of 21 U.S.C. § 841(a)(1) and appellant Vera was convicted of possession of hashish in violation of 21 U.S.C. § 844.[1]

Co-defendants Diego Adamo, Peter Riccardi and Saleh Hassan were charged with conspiracy to distribute quaaludes in violation of 21 U.S.C. § 846.[2] Riccardi pled guilty, Adamo was acquitted, and Hassan failed to appear for trial.

### Facts

On July 23, 1980, Drug Enforcement Administration ('DEA') undercover agent Richard Fiano and confidential informant Bobby Kulch met with co-defendant Riccardi at a restaurant in Miami, Florida. Riccardi told Fiano that appellant Romero had approximately 400,000 quaalude tablets for sale at a price of 75 cents per tablet. This price included a five cent per tablet commission for Riccardi and Kulch. Fiano informed Riccardi that he wanted to purchase the drugs and could get the money in a couple of hours. After making several unsuccessful attempts to telephone Romero, Riccardi received a telephone call in the restaurant lounge. Riccardi then told Fiano and Kulch to follow him to the Lucky Travel Service.

Upon arriving at the travel agency, Riccardi, Fiano and Kulch went to a room in the back of the office where they met appellant Romero and co-defendant Hassan. Hassan indicated that he would act as an interpreter for Romero because Romero was not fluent in English. Fiano asked Romero how many quaalude tablets were available. Romero left the room to make a telephone call and returned, stating "400,000" in Spanish. Fiano then asked how the drugs would be delivered. Hassan explained that Fiano would have to provide a closed van to be used to pick up the quaalude tablets. Hassan would deliver the quaalude tablets in the van to a prearranged location where a person designated by Fiano could inspect the tablets. The person designated by Fiano would then telephone Fiano at the travel agency to authorize payment for the drugs. Fiano, Hassan and Romero agreed to consummate the transaction on the following day.

At approximately 12:30 P.M. on July 24, 1980, Hassan telephoned Fiano and told him to come to the Lucky Travel Service. Fiano and Kulch drove to the travel agency and were followed by DEA undercover agent Charles Gardner in an unmarked DEA van. Upon arriving at the travel agency, Fiano and Kulch met with Riccardi, Hassan, Romero and co-defendant Adamo in the back room. Fiano stated that he had selected the Air Park Shopping Center as the delivery site. Fiano then showed Hassan the money and introduced him to agent Gardner, who was waiting outside by the van. Agent Gardner was to inspect the drugs at the delivery site and then call Fiano at the travel agency.

Hassan indicated that it would take approximately two hours to complete the delivery. He explained that he would pick up some of the "stuff" at a "warehouse" and then would meet with Romero to collect the remainder of the load. Adamo told Fiano that he should call the travel agency at 2:30 P.M.

Fiano then walked outside and waited by the van with agent Gardner. Approximately 40 minutes later, Fiano walked back inside the travel agency to determine the cause for the delay. Fiano saw appellant Vera together with Hassan, Adamo and Romero in the back room. Vera and Rome-

---

**1.** Appellant Vera was acquitted of the charge of possession with intent to distribute hashish.

**2.** Co-defendant Hassan was also charged with possession with intent to distribute quaaludes in violation of 21 U.S.C. § 841(a)(1), distribu-

tion of quaaludes in violation of 21 U.S.C. § 841(a)(1), and use of a communication facility in the commission of a felony in violation of 21 U.S.C. § 843(b).

ro were conversing in Spanish. Fiano could not understand what they were saying. Hassan informed Fiano that there was a slight delay. Fiano then went back outside to wait with Gardner.

At approximately 2:20 P.M., Vera and another individual left the travel agency in Vera's Corvette and drove to a Burger King restaurant located in the Air Park Shopping Center. Shortly thereafter, Hassan joined agent Gardner in the DEA van and drove to the Air Park Shopping Center. Hassan left Gardner at a bank of telephone booths in the shopping center and then parked the van next to Vera's Corvette near the Burger King restaurant. After a brief conversation, Hassan and Vera left the shopping center. Vera was driving his Corvette and Hassan was following in the van.

After driving several miles and briefly stopping at an apartment complex, Hassan and Vera stopped at another shopping center where they exchanged vehicles. Vera then drove the van to appellant Posada's house, leaving Hassan at the shopping center with the Corvette. Vera parked the van next to a shed located by the house. After a brief conversation, Vera, Posada and a third individual entered the shed.

Approximately 20 minutes later, Vera and Posada emerged from the shed carrying a box measuring approximately three feet in width and one and a half feet in height which they loaded into the van. After loading another box of approximately the same size, Vera and Posada loaded several smaller boxes and two mattresses into the van. Vera then left in a red Toyota truck that had been parked in front of Posada's house and drove to the shopping center where Hassan was waiting. Shortly thereafter, Posada drove the van to the same shopping center and left the van with Hassan.

Hassan then drove the van to Romero's house and parked it next to the garage. About half an hour later, Romero arrived and assisted Hassan in loading several boxes measuring approximately one foot in width and one and a half feet in height

from the garage into the van. Although Romero's house was under surveillance, the agents could not determine whether anything had been removed from the van at Romero's house. Hassan then drove the van to the Air Park Shopping Center where agent Gardner was waiting. Romero followed Hassan in another vehicle.

Agent Gardner entered the back of the van, opened two of the boxes and examined the tablets taken from the plastic bags inside the boxes. Gardner then telephoned agent Fiano at the Lucky Travel Service and informed him that the delivery had been completed.

DEA agents then arrested Hassan and Romero at the shopping center, and Adamo and Riccardi were arrested at the travel agency. Inside the van, the agents found two large boxes which were approximately the same size as the two large boxes placed in the van by Vera and Posada and eight smaller boxes. Each of the boxes contained quaalude tablets packed in plastic bags. Some of the boxes were "torn and broken," and a white powdery substance was seeping out of one of the large boxes. The agents found a total of 388,000 tablets in the boxes. The van also contained a broken bicycle tire rim, part of a box spring for a bed and a broken lamp.

Following his arrest and after being advised of his *Miranda* rights, Romero told DEA agent Armando Marin that there were more quaalude tablets and some hashish in his house. With Romero's consent, the agents searched his house and discovered a plastic bag containing quaalude tablets and a box containing 55 pounds of hashish. Later that evening, the agents arrested Vera and found 860 grams of hashish in his pants. The chemical composition of the hashish in Vera's possession and the hashish found in Romero's house was identical.

### Voir Dire

Prior to impanelling the jury, the district court informed the prospective jurors of the

allegations contained in the indictment and briefly instructed them on the presumption of innocence and the government's burden of proof. The court then conducted a general voir dire examination of the prospective jurors. Thereafter, the court allowed counsel to further question the jury panel.

Counsel for Romero and Adamo asked prospective juror Beth Fox whether she would "expect to hear both sides of the story, that of the government and that of the defendant." Miss Fox replied "Certainly, I would." [3] Defense counsel then moved to challenge Miss Fox for cause. The court denied the motion and restricted defense counsel from further questioning the prospective jurors as to their understanding of the law. However, the court permitted defense counsel to inquire into the background of the prospective jurors.

Immediately after denying defense counsel's motion to challenge Miss Fox for cause, the court instructed the jury as follows:

> One of the principles is that each of the defendants is presumed by law to be innocent. And the law does not require a defendant to prove his innocence or present any evidence at all. They may rely entirely on what the government has presented. The government has the burden of proving each defendant guilty beyond a reasonable doubt. And if the government fails in that respect, you must return a verdict acquitting the defendant, as to any count which the government fails to meet its burden of proof.

The court then asked whether any of the prospective jurors were unwilling or unable to follow the court's instructions on the law. None of the prospective jurors responded affirmatively. Defense counsel subsequently exercised a peremptory challenge, resulting in the dismissal of Miss Fox from the jury panel.

Appellants Vera and Posada contend that the district court erred in restricting defense counsel's voir dire examination of the jury panel. Vera and Posada argue that the district court should have permitted further inquiry concerning the jury panel's understanding of the government's burden of proof once it became apparent that one of the prospective jurors was confused as to the proper allocation of the burden of proof.

■ The purpose of voir dire is to enable the defendant to evaluate the prospective jurors and select a fair and impartial jury. *United States v. Shavers,* 615 F.2d 266, 268 (5th Cir.1980). The method of conducting the voir dire is left to the sound discretion of the trial court and will be upheld unless an abuse of discretion is found. *United States v. Butera,* 677 F.2d 1376, 1383 (11th Cir.1982); *United States v. Brooks,* 670 F.2d 148, 152 (11th Cir.1982). The voir dire conducted by the trial court need only provide "reasonable assurance that prejudice will be discovered if present." *United States v. Holman,* 680 F.2d 1340, 1344 (11th Cir.1982); *United States v. Delval,* 600 F.2d 1098, 1102 (5th Cir.1979); *United States v. Nell,* 526 F.2d 1223, 1229 (5th Cir.1976).

---

**3.** Defense counsel further examined prospective juror Fox as follows:

> DEFENSE COUNSEL: And you have understood the Court's instructions up to this point in time; is that correct?
> MISS FOX: Yes.
>
> \* \* \* \* \* \*
>
> DEFENSE COUNSEL: Miss Fox, are you aware of the fact that the burden of proof in this particular case is upon the government?
> MISS FOX: I don't know what that means.
> DEFENSE COUNSEL: Did you hear the Court in his instructions to you with respect to the burden of proof?

> MISS FOX: I don't know what you mean.
> DEFENSE COUNSEL: Did you hear the Court mention the words, "burden of proof?"
> MISS FOX: I don't recall that, if he did.
> DEFENSE COUNSEL: Did you hear the Court mention the term "presumption of innocence?"
> MISS FOX: Yes.
> DEFENSE COUNSEL: If the Court advised you that the burden is only upon the government, would you, nonetheless, expect to hear from the defense of the defendants?
> MISS FOX: Yes.

■ In questioning prospective juror Fox, defense counsel was not attempting to reveal any bias or prejudice, but rather sought to determine whether the prospective jurors were willing and able to properly apply the law. In particular, defense counsel was concerned with Miss Fox's apparent misunderstanding of the government's burden of proof. A trial court, however, does not abuse its discretion in precluding voir dire examination of the prospective jurors' understanding of the law provided that the court's general voir dire questions and jury charge afford the protection sought by counsel. *Jacobs v. Redman*, 616 F.2d 1251, 1255–56 (3d Cir.), *cert. denied*, 446 U.S. 944, 100 S.Ct. 2170, 64 L.Ed.2d 799 (1980); *United States v. Goodwin*, 470 F.2d 893, 897–98 (5th Cir.), *cert. denied*, 411 U.S. 969, 93 S.Ct. 2160, 36 L.Ed.2d 691 (1973); *Stone v. United States*, 324 F.2d 804, 807 (5th Cir.1963).

■ When it became apparent that prospective juror Fox was confused as to the principles of law to be applied, the district court further instructed the jury panel on the government's burden of proof, emphasizing that a defendant is presumed innocent and not required to present any evidence at all. Upon further inquiry by the court following this instruction, none of the prospective jurors indicated an unwillingness or inability to follow the law. In its charge at the conclusion of the trial, the court again instructed the jury on the presumption of innocence and the government's burden of proof, stating several times that the law does not require a defendant to prove his innocence, testify in his own behalf, or present any evidence at all. The district court's thorough instructions to the jury on the government's burden of proof and its careful questioning as to the prospective jurors' ability and willingness to properly apply the law clearly afforded the protection sought by defense counsel. Accordingly, the district court did not abuse its discretion in precluding defense counsel from further questioning the prospective jurors as to their understanding of the law.

■ Appellants Vera and Posada further argue that the district court erred in denying defense counsel's motion to challenge prospective juror Fox for cause, thereby forcing counsel for defendants to exercise all of their peremptory challenges. However, appellants have failed to show any bias or prejudice that would have disqualified Miss Fox. The district court, therefore, did not abuse its discretion in denying defense counsel's motion to challenge prospective juror Fox for cause. *United States v. Butera, supra* at 1384; *United States v. Salinas*, 654 F.2d 319, 328 (5th Cir.1981).

■ In any event, the district court granted defendants a total of 12 peremptory challenges. Consequently, defendants were given two more peremptory challenges than they were entitled to under Rule 24(b) of the Federal Rules of Criminal Procedure. Accordingly, even assuming that the district court erred in refusing to dismiss Miss Fox for cause, the error would have been harmless since it would not have had the effect of improperly reducing the number of peremptory challenges which defendants were entitled to under Rule 24(b). *United States v. Nell, supra* at 1230; *United States v. Boyd*, 446 F.2d 1267, 1275 n. 27 (5th Cir.1971).

### Sufficiency of the Evidence

Appellants Vera and Posada contend that the evidence fails to establish that they knowingly participated in the conspiracy or that they knowingly possessed and distributed the quaalude tablets. Vera and Posada, therefore, argue that the district court erred in denying their motions for judgment of acquittal.

■ The standard of review in assessing the sufficiency of the evidence is whether, viewing the evidence together with all reasonable inferences in the light most favorable to the government, *Glasser v. Unit-*

*ed States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed.2d 680 (1942), a reasonable jury could conclude that the evidence established guilt beyond a reasonable doubt. *United States v. Pierre,* 688 F.2d 724, 725 (11th Cir.1982); *United States v. Roper,* 681 F.2d 1354, 1359 (11th Cir.1982); *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (Unit B en banc). A conviction must be reversed, "if a reasonable jury must necessarily entertain a reasonable doubt as to the defendant's guilt." *United States v. Marx,* 635 F.2d 436, 438 (5th Cir.1981). However, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. (Footnote omitted.) A jury is free to choose among reasonable constructions of the evidence." *United States v. Bell, supra* at 549.

■■■■ To support a conviction of conspiracy, the government must prove that an agreement existed between two or more persons to commit a crime and that the defendant knowingly and voluntarily joined or participated in the conspiracy. *United States v. Vergara,* 687 F.2d 57, 60 (5th Cir.1982); *United States v. Glasgow,* 658 F.2d 1036, 1040 (5th Cir.1981); *United States v. Littrell,* 574 F.2d 828, 832 (5th Cir.1978). In conspiracy cases brought under 21 U.S.C. § 846, the government is not required to prove the commission of an overt act in furtherance of the conspiracy. *United States v. Vergara, supra* at 61. Because knowledge, intent and participation are necessary elements of the crime of conspiracy, the government must prove each of these elements beyond a reasonable doubt. *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); *United States v. Marx, supra* at 439; *United States v. Salinas-Salinas,* 555 F.2d 470, 473 (5th Cir.1977).

■■■■ Close association with a co-conspirator or mere presence at the scene of the crime is insufficient evidence of knowing participation in a conspiracy. *United States v. Davis,* 666 F.2d 195, 201 (5th Cir. 1982). However, direct evidence of the elements of a conspiracy is not required. A defendant's knowing participation in a conspiracy may be established through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy. *United States v. Vergara, supra* at 61; *United States v. Marx, supra* at 439; *United States v. Middlebrooks,* 618 F.2d 273, 278 (5th Cir. 1980).

■■■■ In order to sustain a conviction of possession with intent to distribute a controlled substance, the government must prove three essential elements: (1) knowing (2) possession of a controlled substance (3) with intent to distribute it. *United States v. Richards,* 638 F.2d 765, 768 (5th Cir.), *cert. denied,* 454 U.S. 1097, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981); *United States v. Johnson,* 469 F.2d 973, 976 (5th Cir.1972). Possession may be actual or constructive and may be proved by circumstantial as well as direct evidence. *United States v. Vergara, supra* at 61; *United States v. Marx, supra* at 440; *United States v. Ocanas,* 628 F.2d 353, 361 (5th Cir.), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981). A person who owns or exercises dominion and control over a motor vehicle or residence in which contraband is concealed may be deemed to be in constructive possession of the contraband. *United States v. Vergara, supra* at 62; *United States v. Marx, supra* at 440.

■■■■ Appellant Vera asserts that the evidence is insufficient to prove knowledge because the government failed to prove that the boxes at Posada's house contained quaaludes when Vera and Posada loaded them into the van. Vera argues that while the van was at Romero's house, Hassan and Romero could have unloaded the boxes placed in the van by Vera and Posada and then loaded the van with different boxes

containing quaaludes. Alternatively, Vera contends that Hassan and Romero could have unpacked the boxes placed in the van by Vera and Posada and then refilled them with quaaludes. In addition, Vera asserts that even if the boxes which Vera and Posada loaded into the van contained quaaludes when Vera and Posada were handling the boxes, there is no evidence that Vera or Posada looked inside the boxes or discussed the contents of the boxes with anyone. Finally, Vera notes that although he had conversations with some of the co-conspirators, there is no evidence as to the substance of those conversations.

As previously discussed, however, direct evidence of knowledge is not required. Rather, knowledge may be proved through inferences based upon surrounding circumstances. *United States v. Vergara, supra* at 61. Moreover, the evidence need not exclude every reasonable hypothesis of innocence, provided a reasonable jury could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. Bell, supra* at 549.

The evidence against Vera can be summarized as follows: Vera was present at the travel agency while final preparations were being made for the delivery of the drugs and had a conversation with Hassan. Vera and Hassan left the travel agency in separate vehicles, met at the prearranged delivery site, had a brief conversation and then continued driving in separate vehicles to another shopping center. Vera then drove the van, which had been provided for the delivery of the drugs, to Posada's house. Vera, Posada and a third individual had a conversation and then spent 20 minutes inside the shed where the boxes they subsequently loaded into the van were located. After the boxes were loaded, Vera left in a Toyota truck and drove back to the shopping center where Hassan was waiting.

The first two boxes which Vera and Posada loaded into the van were approximately three feet in width and one and a half feet in height and were substantially larger than the other boxes placed in the van by Vera and Posada. These two boxes were also considerably larger than the boxes loaded into the van by Hassan and Romero. When the agents entered the van at the Air Park Shopping Center, they found two large boxes, which were approximately the same size as the two large boxes placed in the van by Vera and Posada, and eight smaller boxes. Agent Gardner testified that when he moved one of the large boxes, white powder began seeping out of the edge of the box and that upon lifting some of the other boxes, he heard "a noise, like small articles tumbling around inside of the box." Agent Gardner further testified that some of the boxes were "torn and broken."

Although the agents could not positively identify any of the boxes found inside the van as the boxes which were loaded into the van by Vera and Posada, their testimony established that the two large boxes placed inside the van by Vera and Posada were approximately the same size as the two large boxes which were later seized from the van and found to contain quaaludes. Moreover, Hassan's statement at the travel agency that he would pick up some of the "stuff" at a "warehouse" and would then meet with Romero to get the remainder of the load provides further support for the conclusion that some of the boxes containing quaaludes were loaded into the van by Vera and Posada at Posada's house. All ten of the boxes found inside the van contained quaaludes. Although it is conceivable that some of the boxes loaded into the van by Vera and Posada may have been unpacked or unloaded at Romero's house, such a possibility does not rise to the level of a reasonable doubt in light of the totality of the evidence.

Other evidence supports the conclusion that Vera knew the boxes which he loaded into the van with Posada contained quaaludes, including the fact that Vera drove the van provided for the delivery to Posada's house after talking to Hassan, spent 20 minutes inside the shed where the boxes

were located, and loaded the boxes into the van. In addition, a white powdery substance was seeping out of one of the large boxes found in the van and some of the boxes in the van were "torn and broken."

Viewing the evidence as a whole in the light most favorable to the government, we cannot say that a reasonable jury must necessarily have a reasonable doubt as to Vera's guilt. A reasonable jury could have concluded beyond a reasonable doubt that the evidence established that Vera knowingly participated in the conspiracy and knowingly possessed and distributed the quaaludes.

■ Posada also argues that the evidence is insufficient to establish that he knowingly participated in the conspiracy or knowingly possessed and distributed quaaludes. Posada notes that the evidence does not reveal the content of any of the conversations he had with Vera and fails to establish that he looked inside the boxes.

Although there is no direct evidence of Posada's knowledge, sufficient circumstantial evidence of his knowledge exists. As previously discussed, Posada and Vera spent 20 minutes inside the shed where the boxes were located and subsequently loaded them into the van. Moreover, Posada owned the shed in which the boxes were stored. After the boxes were loaded into the van, Posada drove the van by himself to the shopping center where Hassan was waiting and left the van with Hassan.

Posada's ownership of the shed where the boxes containing the quaaludes were located and his exercise of dominion and control over the boxes while driving the van to the shopping center clearly supports an infer-

ence that he knowingly possessed the boxes containing quaaludes. Viewing the evidence in the light most favorable to the government, it is clear that a reasonable jury could find beyond a reasonable doubt that Posada knowingly participated in the conspiracy and knowingly possessed and distributed the quaaludes.

In support of their argument that the evidence fails to establish knowledge, Vera and Posada rely on *United States v. Littrell,* 574 F.2d 828 (5th Cir.1978) and *United States v. Aguiar,* 610 F.2d 1296 (5th Cir.), cert. denied, 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 31 (1980). In *Littrell,* the defendant drove a car to a designated location and left it with a co-conspirator. After the defendant had left, the co-conspirator removed some cocaine from the car. Under such circumstances, it would be equally reasonable to infer that the defendant was unaware not only of the conspiracy or that he was delivering drugs, but that he was delivering anything at all. *See United States v. Roper, supra* at 1359. Similarly, the only evidence against the defendant in *Aguiar* was that he was present in a house used in the conspiracy and made the statement "They're here" after talking to a co-conspirator on the telephone. Consequently, unlike the case at bar, the evidence in *Littrell* and *Aguiar* merely established the defendant's presence at the scene of the crime and, therefore, was insufficient to support a conviction.[4] In the case at bar, Vera and Posada performed numerous acts in furtherance of the purpose of the conspiracy.

Similarly, the other cases cited by Vera and Posada are inapposite. In *United States v. Craig,* 522 F.2d 29 (6th Cir.1975),

---

4. Appellant Vera also cites *United States v. Glasgow,* 658 F.2d 1036 (5th Cir.1981) and *United States v. DeSimone,* 660 F.2d 532 (5th Cir.1981). In *Glasgow,* the defendant drove a van, which contained a log book for an airplane containing marijuana, to a repair shop and then left the van at a co-conspirator's house. In *DeSimone,* the evidence showed that the defendant associated with some of the co-conspirators on several occasions and fled in a vehicle

when police officers approached the delivery site.

As in *Littrell* and *Aguiar,* the evidence in *Glasgow* and *DeSimone* established little more than mere presence at the scene of the crime. In the case at bar, however, Vera and Posada performed numerous acts in furtherance of the purpose of the conspiracy such as loading the boxes of quaaludes into the van and driving the van.

the evidence showed that the defendant gave a co-conspirator, who was carrying a closed box containing contraband, a ride in his truck to an apartment. After the co-conspirator had gone into the apartment with the box, the defendant drove away when agents moved toward the apartment. There was no evidence that the defendant had carried the box containing drugs. Rather, the evidence showed that the co-conspirator was in sole possession of the box. In the case at bar, however, Vera and Posada loaded the boxes containing the quaaludes into the van and performed other acts in furtherance of the purpose of the conspiracy.

In *United States v. Franklin,* 586 F.2d 560 (5th Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1536, 59 L.Ed.2d 789 (1979), the defendant was convicted of both the substantive and conspiracy charges relating to the interstate transportation of stolen goods. Franklin was present at the warehouse where the stolen art prints were stored and replied "yes" when a co-conspirator asked "if everything was okay." The evidence also established that Franklin helped in loading the stolen prints, which were completely covered in wrapping material, into the trunk of a co-conspirator's car. On appeal, the Fifth Circuit reversed the conviction, holding that the evidence failed to establish that Franklin knew that the contents of the packages were stolen. Unlike the case at bar, however, the government in *Franklin* was required to prove not merely knowledge of the contents of the packages, but knowledge that the contents were stolen. In any event, there is more circumstantial evidence of knowledge in the case at bar than in *Franklin.*

In *United States v. Pruett,* 551 F.2d 1365 (5th Cir.1977), the defendant claimed a package addressed to her at the post office which contained contraband and returned home. Upon obtaining a warrant, the agents entered the house and found the package but could not determine whether the package had been opened. The court found that there was insufficient evidence of the defendant's knowledge of the contents of the package. In the case at bar, however, it is clear that substantially more circumstantial evidence of knowledge exists than the mere receipt of a package in the mail.

Vera and Posada cite *United States v. Squella-Avendano,* 478 F.2d 433 (5th Cir. 1973), asserting that the sole reason of the court for upholding the defendant's conviction of possession of cocaine was the evidence that the defendant looked inside one of the boxes containing the contraband while he was unloading the shipment. However, the evidence in *Squella-Avendano* also established that the defendant owned and piloted the plane containing the boxes of cocaine. The court indicated that this evidence alone was sufficient to support an inference that the defendant knew the contents of the boxes. Consequently, the court did not rely solely upon the evidence that the defendant looked inside the box in holding that sufficient evidence of the defendant's knowledge of the contents of the box existed.

### Prosecutor's Comments

Appellants Vera and Posada contend that the prosecutor grossly misstated the facts during his closing argument. Vera and Posada argue that their convictions should be reversed and the case should be remanded for a new trial because of the prejudicial nature of these comments.

During his closing argument, the prosecutor stated:

> [Y]ou will recall that Agent Gardner testified that when he received these boxes, that they were in poor condition. They were opened and they were not taped up with the DEA evidence stickers at that time, as they are now. At that time they were beat-up and the flaps were open.

After overruling defense counsel's objection to these comments, the district court instructed the jury that they were to rely on

their collective recollection of the evidence and not on counsel's summary of the evidence.

Vera and Posada assert that there was no evidence that the flaps of the boxes were open when the boxes were seized. Although the record reveals that none of the witnesses specifically stated that the flaps of the boxes were open, agent Gardner testified that some of the boxes seized from the van were "torn and broken" and had to be reinforced with tape. Agent Gardner further testified that the flap of one of the boxes had been torn off and that another box had to be totally reconstructed because it had been "torn all to pieces" and "ripped to shreds" and, therefore, was "flat and opened."

 The test for determining whether a prosecutor's comments warrant the granting of a new trial is (1) whether the remarks were improper and (2) whether they prejudicially affected substantive rights of the defendants. *United States v. Butera, supra* at 1383; *United States v. Dorr,* 636 F.2d 117, 120 (5th Cir.1981); *United States v. Garza,* 608 F.2d 659, 663 (5th Cir.1979). A prosecutor may not seek to obtain a conviction by going beyond the evidence before the jury. *United States v. Phillips,* 664 F.2d 971, 1030 (5th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). "The sole purpose of closing argument is to assist the jury in analyzing, evaluating and applying the evidence." *United States v. Dorr, supra* at 120.

 In light of agent Gardner's testimony concerning the condition of the boxes when they were seized from the van, the prosecutor's comment that the "flaps were open" certainly was not a gross misstatement of the facts. In any event, the court's instruction to the jury immediately following defense counsel's objection to the comments cured any error that may have occurred as a result of the comments. Accordingly, any error that may have resulted

from the prosecutor's comments was harmless.

 The prosecutor also made the following statement during closing argument:

Now, competent and able counsel for Mr. Posada will claim, and you have got to admit that it is his house, you have got to admit that he is seen carrying boxes, will claim that he doesn't know what is in the boxes. And I ask you, how credible is that, in light of these circumstances? One, it is his house. It is his small shed.

Posada contends that by making these comments, the prosecutor placed defense counsel's credibility in issue, and therefore deprived Posada of his Sixth Amendment right to effective assistance of counsel. Vera adopts this argument.

It is clear, however, that the prosecutor was not attacking the credibility of defense counsel but rather was challenging the credibility of Posada's defense. The prosecutor was simply trying to rebut the defense that Posada was unaware of the contents of the boxes which he loaded into the van. Accordingly, neither Posada nor Vera was deprived of their right to effective assistance of counsel as a result of the prosecutor's comments.

### Comments by Government Witness and Defense Counsel

Appellant Vera contends that comments during the trial made by a government witness and counsel for co-defendant Adamo violated his Fifth Amendment right to remain silent both at the time of his arrest and at trial. Accordingly, Vera argues that the district court erred in failing to grant a mistrial.

On cross-examination by counsel for Vera, John Wagner, the DEA agent who arrested Vera, testified as follows:

[Defense counsel]: Did you ever, from the start to the finish in your investigation, hear Ray Vera discuss anything criminal relating to negotiations for

Methaqualone with anyone? Do you have to think about that?

[Agent Wagner]: I'm trying to recall whether he said anything at the time of the arrest.

[Defense counsel]: That is not what I asked you.

[Agent Wagner]: You said from the start to the finish of the investigation.

[Defense counsel]: No. What I asked you was, did you ever hear Ray Vera discuss with anyone any negotiations or terms as to the fulfillment of a deal or Methaqualone negotiations?

[Agent Wagner]: No.

Thereafter, counsel for Vera moved for a mistrial, asserting that agent Wagner had improperly commented on Vera's failure to make a statement at the time of his arrest. The district court denied the motion but offered to give a cautionary instruction to the jury. Counsel for Vera, however, indicated that she would prefer that no instruction be given.[5]

The other comment which appellant Vera refers to was made by counsel for Adamo during closing argument. Counsel for Adamo stated:

Now if, indeed, Fiano does not know, who does know? Adamo knows. The only person to come forward and tell you what was in my [sic] mind and what I [sic] said, was Mr. Adamo. And Mr. Adamo told you in the conversations what occurred. After Fiano left, who was there left to rebut it?

\* \* \* \* \* \*

Who was there to say to you good jurors, "Mr. Adamo is not telling you the truth?" There was one person, Mr. Kulch. Why didn't the government bring him in? They make much of the fact that he was there when Fiano left. I don't have any access to him. Only the government

does. I didn't pay him $4,500. The government paid him $4,500. You may infer just as a matter of simple logic that if the government did not bring him in, it couldn't have helped their case. I couldn't locate him. I was never given his address. And if the government wanted you truly to believe that Mr. Adamo spoke other than he told you, why didn't they produce that testimony?

Counsel for Vera subsequently moved for a mistrial and alternatively for a severance. The district court denied these motions.

■ The standard for determining if there has been an impermissible comment on a defendant's right to remain silent at the time of his arrest or his right not to testify at trial is "whether the statement was manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Dearden,* 546 F.2d 622, 625 (5th Cir.), *cert. denied,* 434 U.S. 902, 98 S.Ct. 295, 54 L.Ed.2d 188 (1977); *see United States v. Hartley,* 678 F.2d 961, 983 (11th Cir.1982); *United States v. Forrest,* 620 F.2d 446, 455 (5th Cir.1980); *United States v. Downs,* 615 F.2d 677, 679 (5th Cir.), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980). In applying this test, the court must "look to the context in which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact upon the jury." *United States v. Forrest, supra* at 455 (quoting *Samuels v. United States,* 398 F.2d 964, 967 (5th Cir.), *cert. denied,* 393 U.S. 1021, 89 S.Ct. 630, 21 L.Ed.2d 566 (1969)).

■ Agent Wagner's comment clearly does not indicate whether or not Vera made a statement at the time of his arrest. Rather, the comment simply indicates that agent Wagner was attempting to recall the

---

5. In response to the court's offer to give a cautionary instruction, defense counsel stated:

No. I rather nothing be said. I think the question, if read back, you might see it that way. But, I do not want to waste your time.

circumstances surrounding the arrest so that he could properly answer the question. Thus, the jury could not have determined from agent Wagner's comment whether or not Vera had made a statement at the time of his arrest. Consequently, it is clear that agent Wagner's remarks did not constitute an impermissible comment on Vera's right to remain silent at the time of his arrest.

 Similarly, the challenged statement of counsel for Adamo, when viewed in context, was not an impermissible comment on Vera's right not to testify at trial. Counsel for Adamo clearly was not referring to the failure of any of the co-defendants to testify at trial, but rather was emphasizing Adamo's willingness to testify and the government's failure to produce a witness to rebut Adamo's testimony. Specifically, Adamo's counsel referred to the failure of the government to produce the testimony of confidential informant Bobby Kulch. The mere favorable observation of the willingness of one of several co-defendants to testify does not constitute an impermissible comment on the failure of the other co-defendants to testify. *United States v. Diecidue,* 603 F.2d 535, 553 (5th Cir.1979); *United States v. Washington,* 550 F.2d 320, 328 (5th Cir.), *cert. denied,* 434 U.S. 832, 98 S.Ct. 116, 54 L.Ed.2d 92 (1977). Accordingly, the comments of Adamo's counsel were not improper.

 Vera further argues that as a result of the comments made by Adamo's counsel, a severance was warranted in accordance with *DeLuna v. United States,* 308 F.2d 140 (5th Cir.1962). In *DeLuna,* counsel for one co-defendant made an adverse comment on the failure of another co-defendant to testify. The court held that where counsel for one co-defendant determines that he must make a comment that would draw the jury's attention to another co-defendant's failure to testify, a severance must be ordered. *Id.* at 141.

As previously discussed, however, counsel for Adamo merely commented on Adamo's willingness to testify and the government's failure to produce a witness to rebut Adamo's testimony. Counsel for Adamo made no adverse reference concerning the failure of any of the co-defendants to testify. Under these circumstances a severance is not required. *United States v. Hodges,* 502 F.2d 586, 587 (5th Cir.1974). Accordingly, the district court did not abuse its discretion in denying Vera's motion for a severance.

### Romero's Admissions and Consent to Search

Appellant Romero contends that the statements which he made following his arrest and his consent to a search of his house were improperly induced by promises of leniency. Romero, therefore, argues that the district court erred in denying his motion to suppress the statements made following his arrest and the contraband found in his garage pursuant to the search.

After agent White arrested Romero in the Air Park Shopping Center, agent Marin asked Romero if he spoke English. Romero replied that he spoke very little English. Agent Marin then read Romero his constitutional rights in Spanish from a card and gave Romero the card to read. After reading the card himself, Romero stated that he understood his rights.

The agents then drove Romero to the DEA office in Miami and placed him in a holding cell. After approximately 30 to 45 minutes, Romero was removed from the holding cell in order to complete a personal history form. After completing the form, agent Marin asked Romero whether he remembered his rights and Romero replied that he did. Marin again told Romero that he did not have to say anything. Romero responded that he was in a "mess" and wanted to help himself. Marin then told Romero that "he could help himself out by telling [Marin] whether there was any ludes available and who brought the ludes in . . . ." Romero replied that he had obtained the quaaludes and that there were more quaaludes and some hashish in his house.

Marin then asked Romero for permission to search his house, reminding Romero that he did not have to consent to a search. Romero agreed to allow the agents to search his house and signed a written consent statement.[6]

Romero and several agents then drove to Romero's house. Marin again told Romero that he did not have to allow the agents to search his house. When they arrived at the house, Romero opened the door for the agents and told Marin that the quaaludes and hashish were in the garage. Romero assisted the agents in locating the contraband which was concealed in a loft above the garage. The agents found approximately 55 pounds of hashish and a plastic bag containing quaalude tablets. Romero stated that he had gotten the hashish from Hassan.

The district court found that Romero's statements and his consent to the search were voluntarily given and, therefore, denied the motion to suppress.

■■■■ A trial court's determination of the voluntariness of a confession will be upheld unless clearly erroneous. *United States v. Watson,* 591 F.2d 1058, 1061 (5th Cir.), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2414, 60 L.Ed.2d 1070 (1979). The applicable standard for determining whether a confession was voluntarily given is whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. *Martinez v. Estelle,* 612 F.2d 173, 177 (5th Cir. 1980) (citing *Greenwald v. Wisconsin,* 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77, 79 (1968)).

■■■■ Clearly, a confession induced by threats or promises is not voluntary. *Bram v. United States,* 168 U.S. 532, 542, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897); *United States v. Barfield,* 507 F.2d 53, 56 (5th Cir), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1684, 44 L.Ed.2d 105 (1975). However, a mere admonition to the accused to tell the truth does not render a confession involuntary. *United States v. Barfield, supra* at 56; *Rivers v. United States,* 400 F.2d 935, 943 (5th Cir.1968). An agent's statement that any cooperation would be reported to the appropriate authority but that no promise of leniency could be made has been held to be insufficient by itself to invalidate an otherwise legal confession. *United States v. Jacks,* 634 F.2d 390, 393 (8th Cir.), *cert. denied,* 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 369 (1981). Similarly, an agent's statement that it would be "helpful" to sign a confession has been held to be insufficient by itself to render a confession involuntary. *United States v. White,* 493 F.2d 3, 5 (5th Cir.), cert. denied, 419 U.S. 901, 95 S.Ct. 186, 42 L.Ed.2d 147 (1974).

■■■■ In the case at bar, Romero was advised of his constitutional rights in Spanish immediately after his arrest. There is no evidence that Romero was threatened or coerced into making the statements or consenting to the search. Romero consented to the search less than one hour after his arrest and executed a written statement stating that the consent to the search was being given voluntarily and was not the result of a threat or promise. Before Romero consented to the search, agent Marin reminded Romero that he did not have to say anything and did not have to agree to a search of his house. When Romero signed the statement, he indicated that he understood his rights.

Under these circumstances, the isolated statement by agent Marin that it would be "helpful" if Romero told Marin whether there were any more quaaludes and who obtained the quaaludes is insufficient to

---

6. The written consent statement signed by appellant Romero states as follows:

I, Luis Enrico Romero, give permission to the Agents of the United States Drug Enforcement [Administration] to search my home, 13901 Southwest 109 Street. I am going to accompany the agents to my house. I give this voluntarily and I have not been threatened or promised anything.

render Romero's statements and consent to the search involuntary. Accordingly, the district court did not err in denying Romero's motion to suppress.

AFFIRMED.