[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-10789

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 06, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 00-00260-CR-1-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee-
Cross Appellant,

versus

CURTIS COLWELL,

Defendant-Appellant-
Cross Appellee.

_____

No. 04-11111

_____

D. C. Docket No. 00-00260-CR-2-1

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

DOUGLAS L. COLWELL,

Defendant-Appellee.

_____

No. 04-14758

_____

D. C. Docket No. 00-00260-CR-2-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DOUGLAS L. COLWELL,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(July 6, 2005)**

Before BLACK and HULL, Circuit Judges, and HODGES[*], District Judge.

PER CURIAM:

Defendants Curtis and Douglas Colwell appeal their criminal convictions

for participation in a conspiracy to commit mail and wire fraud in violation of 18

_____

[*]Honorable William Terrell Hodges, United States District Judge for the Middle District of Florida, sitting by designation.

U.S.C. § 371. Curtis Colwell also appeals his convictions for wire fraud, in violation of 18 U.S.C. § 1341, and mail fraud, in violation of 18 U.S.C. § 1343. The government appeals the district court's grants of a four-level downward departure to Curtis Colwell and a three-level downward departure to Douglas Colwell.[1] After review and oral argument, we affirm the defendants' convictions and sentences.

## I. BACKGROUND

The defendants in these cases defrauded various insurance companies in obtaining worker's compensation insurance for the defendants' businesses. By law, employers in Georgia are required to carry worker's compensation insurance for all employees. The employer's premium is determined by the number of employees, the amount of payroll, the employees' jobs, and the employer's loss history. The defendants defrauded the insurance companies by submitting false paperwork regarding the number of employees, the amount of the payroll, the type of work the employees were to perform, and the companies' loss history. We thus begin by discussing the details of the defendants' insurance fraud.

### A. The Fraudulent Conduct

---

[1]Curtis Colwell filed the first appeal from his conviction (Appeal No. 04-10789). The government filed a cross appeal from the sentences for both Curtis and Douglas Colwell (Appeal No. 04-11111). The two appeals were consolidated on March 26, 2004. Douglas Colwell initiated a separate appeal from his conviction (No. 04-14758) on August 26, 2004. We hereby consolidate Appeal No. 04-14758 with Appeal Nos. 04-10789 and 04-11111.

## 1. Fireman's Fund

Defendants Curtis and Douglas Colwell operated several granite quarry/road paving companies in Georgia. William Plemons was the Colwells' insurance agent and Russell Smith provided the Colwells with accounting services. Beginning in April 1989, Curtis Colwell, Plemons, and Smith provided inaccurate job classification and understated payroll information to Fireman's Fund Insurance Company ("Fireman's Fund") to avoid paying the worker's compensation premium that would have otherwise been due. Plemons submitted the insurance application to Fireman's Fund and Smith provided inaccurate information in the annual audits through April 1995. In total, the Colwell businesses defrauded Fireman's Fund out of an estimated $740,849 in lost premiums.[2]

In March 1995, Curtis Colwell, Plemons, and Bob Carr met to discuss how to handle worker's compensation coverage after Fireman's Fund ceased providing coverage. Plemons suggested that a new employee leasing company, essentially a shell company, be formed to enable the Colwell businesses to avoid paying higher premiums due to the Colwell businesses' loss history. Curtis Colwell suggested that Douglas Colwell set up the employee leasing company.

_____

[2]In 1995, Fireman's Fund ceased writing this type of insurance in Georgia.

4

## 2. Douglas Colwell Joins the Conspiracy

On March 30, 1995, Plemons, Carr, and Curtis and Douglas Colwell met to discuss their insurance needs. Prior to the meeting, the Colwells had set up a shell company named Wildhorse Land Development ("Wildhorse"). Plemons brought an insurance application to the meeting and instructed Carr to write in the number of Wildhorse employees as 11 and the payroll amount as $245,000. In reality, the actual number of employees of the Colwell businesses was over 100 with a total payroll of approximately $2.4 million.

The insurance application also indicated that the Wildhorse employees were engaged in buying, selling, and developing land, when in fact many Colwell employees were quarry and road workers. In addition, the application indicated that Wildhorse had no employee exchange agreements with any other company, when in fact the Wildhorse business was the shell company used to lease employees to Colwell businesses.

Douglas Colwell signed the insurance application during the meeting and submitted it to Granite States Insurance Company ("Granite States"), which provided insurance to Wildhorse. On the Georgia state tax registration, Douglas Colwell was listed as Wildhorse's president and his personal address was listed as the business location. In contrast to the insurance application, the tax registration

indicated that Wildhorse would have 100 employees at full operation.

**B.    Insurance Investigations**

Granite States asked Jim Adkins, a loss control consultant, to investigate Wildhorse.  During a telephone call with Douglas Colwell in July, 1995, Douglas Colwell told Adkins that Wildhorse was a sole proprietorship, that he was in charge of the company, that Wildhorse had seven employees, and that the employees were laborers who cleaned up around the entrance of a development. Douglas Colwell also told Adkins that Wildhorse was going to grade land for a condominium complex, that there was nothing going on at present, that Wildhorse would probably hire subcontractors in the future, and that it was not necessary for Adkins to visit the business location.  Douglas Colwell explained that the reason Wildhorse had such limited activity was because he had been sick and hospitalized for a period of time.

Tim Wilson, an insurance auditor, sent a letter to Douglas Colwell in connection with conducting a "pre-audit" of Wildhorse. Upon receiving the letter, Douglas Colwell brought the letter to Carr.  Douglas Colwell also called Plemons about the letter and was told to call Smith.

On September 8, 1995, Wilson met Douglas Colwell outside a convenience store in Blairsville, Georgia.  Wilson completed an audit questionnaire during the

meeting in which he indicated that Douglas Colwell verified the payroll and job classification information that had been provided in the insurance application.[3] Douglas Colwell told Wilson that Wildhorse was a new land development business that was going to concentrate on land development activities (such as grading roads and lots and doing building-site preparation for land to be sold for subdivisions), that he was the sole officer, and that he supervised all of the operations. Douglas Colwell also took Wilson to some property and let Wilson take pictures of the property so that Wilson would believe that Wildhorse was in the business of buying, grading, preparing, and subsequently selling land.[4]

In December 1995, Granite States asked Wildhorse to provide an IRS payroll report (a "941 Form") for the third quarter of 1995. Smith prepared an inaccurate 941 Form. Carr, who was then working undercover as a government informant, brought the 941 Form to Douglas Colwell, who refused to sign it. Curtis Colwell signed the form, and Carr then showed it to Douglas Colwell.

---

[3]Douglas Colwell provided payroll amounts of $1,712 for the second quarter of 1995 and $2,751 for the third quarter

[4]Plemons was arrested on unrelated insurance fraud charges. In October 1995, a family meeting was convened between Curtis and Douglas Colwell, and their father – Carleton Colwell – at which time it was decided that the Colwells would terminate the relationship with Plemons as their insurance broker. However, on November 7, 1995, during a subsequent meeting in Helen, Georgia, attended by Curtis and Douglas Colwell, Carr, Plemons, and another Colwell employee, Plemons touted his prior accomplishments on behalf of the Colwells, such as saving $2.2 million in worker's compensation premiums, and convinced the Colwells to keep him as their agent.

In 1996, Curtis Colwell and Plemons decided to purchase insurance coverage from three carriers. In addition to the policy that Wildhorse had with Granite States, one of the Colwell companies, Colwell Construction, obtained coverage through Liberty Mutual, while a new Colwell company, Appalachian Environmental Material Consultants, obtained coverage through National American Insurance Company. In the applications, all three insurance companies were provided false information on the number of employees, the payroll amounts, and the job classifications of the employees. The total amount of lost premiums was $453,028 to Granite States, $19,228 to Liberty Mutual, and $81,146 to National American.

## C. The Criminal Proceedings

On April 19, 2000, a federal grand jury returned an indictment charging five defendants in a total of six counts. Douglas and Curtis Colwell were charged with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 371, as part of the scheme to defraud worker's compensation insurance carriers. Curtis Colwell was also charged with one count of wire fraud, in violation of 18 U.S.C. § 1341, and one count of mail fraud in violation of 18 U.S.C. § 1343. The Colwells entered not guilty pleas and went to trial. Smith and Plemons, two of their co-defendants, plead guilty and testified at the Colwells' trial.

8

### 1.     The Prior Fraud Testimony

The Colwells' trial commenced on May 28, 2003.  Both Smith and Plemons, on direct examination, admitted that they had partaken in similar fraudulent conduct not involving the Colwell businesses on previous occasions over a period of years.  During Plemons's cross-examination, counsel for Curtis Colwell attempted to elicit the identities of the persons with whom Plemons had previously engaged in the similar fraudulent conduct.  The government objected on relevancy grounds.  Noting that the evidence raised "a very plain 403 problem," the district court sustained the objection, stating that:

> given the considerable evidence that points to bias, interest and the like, and his own admission that he has done this on many other occasions over an extended period of time. . . I'm going to sustain the government's objection to that evidence.

The district court, however, did permit defense counsel for Curtis Colwell to inquire into the nature of the prior fraudulent activity, stating that "[i]f you want to inquire of him [Plemons] more to confirm that it is the same sort of activity in terms of matters that deal with premium reductions, false premium reductions, I'll permit you to do that."  The district court also gave Curtis Colwell the opportunity to proffer what information he expected to elicit were the unidentified persons called to testify.  Counsel for Curtis Colwell proffered that the witnesses would

9

testify that they were unaware that Plemons was submitting inaccurate information to insurance companies and that Plemons hid the fraudulent conduct from them.[5]

Following a four-week trial, a jury convicted the Colwells on all counts.

## 2.    Sentencing

At the sentencing hearing, Ted Robertson, an IRS investigating officer, testified that the Colwell businesses had paid Fireman's Fund $353,708 in premiums and that Fireman's Fund anticipated paying a total of $633,344 in claims.  Robertson testified that no worker's compensation claims were filed against (or paid by) Granite States, Liberty Mutual, or National American during the period that they provided worker's compensation insurance to the Colwell businesses.

Carlton Colwell, the father of the defendants, testified that Curtis Colwell had run Colwell Construction for approximately 30 years, that only Curtis was capable of running the company, and that if Curtis was unable to run the businesses, they would fail.  Robbie McClure, an office manager for the Colwell businesses, testified that the businesses employed fifty-eight full-time employees and that if Curtis Colwell were not able to manage the businesses, they "would go

---

[5]At the close of Smith's testimony, Curtis Colwell renewed the argument that he be permitted to learn the identities of the individuals with whom Plemons and Smith had previously engaged in similar fraudulent conduct, and the district court again declined to permit inquiry into the identities of these persons.

under." In addition, McClure testified that approximately eleven trucking companies (employing seventy-seven people) and approximately ten paving companies (employing approximately 135 people) rely on Colwell Construction for all or nearly all of their business. He also testified that private contractors, which provide approximately 45% - 50% of the Colwell business, would not want to do business with the Colwell businesses if Curtis Colwell was not running the businesses.

The district court determined that the loss attributable to Curtis Colwell's conduct was $1,170,000 — $740,000 in unpaid premiums to Fireman's Fund and $430,000 in unpaid premiums to Granite States, Liberty Mutual, and National American. Curtis Colwell's base offense level of 6 was increased by (a) 11 levels due to this loss amount, and (b) 2 levels because the offense involved more than minimal planning. This resulted in a total offense level of 19. Based on a criminal history of category I and a total offense level of 19, the guidelines range was 30 to 37 months' imprisonment.

The district court then granted Curtis Colwell a 4-level downward departure to offense level 15, which reduced the guidelines range to 18 to 24 months' imprisonment. The district court based the departure on its finding that the loss amount of $1,170,000 as to Curtis Colwell overstated the seriousness of his

offenses and that Curtis Colwell's imprisonment would have a detrimental effect on the Colwell businesses and thus the employees of those businesses. The district court sentenced Curtis Colwell to 18 months' imprisonment, the low end of the guidelines range.

The district court determined that the loss attributable to Douglas Colwell's conduct was $400,000 in unpaid premiums to Granite States. Douglas Colwell's base offense level of 6 was increased by (a) 9 levels due to this loss amount, and (b) 2 levels because the offense involved more than minimal planning. The district court then subtracted 4 levels due to Douglas Colwell's minimal role in the offense. This resulted in a total offense level of 13. Based on a criminal history of category I and a total offense level of 13, the guidelines range was 12 to 18 months' imprisonment.

The district court then granted Douglas Colwell a 3-level downward departure to offense level 10, which reduced the guidelines range to 6 to 12 months' imprisonment. The district court based the departure on its finding that the loss amount as to Douglas Colwell overstated the seriousness of his offense. The district court sentenced Douglas Colwell to 6 months' home confinement.

Curtis and Douglas Colwell appeal their convictions. The government appeals both of their sentences.

## II. DISCUSSION

After review and oral argument, we conclude that the government has not shown reversible error as to the sentences of defendants Curtis Colwell or Douglas Colwell.[6] We further conclude that the defendants' appeals of their convictions clearly lack merit. In fact, only two of the issues in this case warrant further discussion: (1) the sufficiency of the evidence to support Douglas Colwell's conviction; and (2) the evidentiary ruling regarding the prior fraudulent conduct of witnesses Plemons and Smith.

### A.    Douglas Colwell's Conviction

We first explain why we reject Douglas Colwell's contention on appeal that there was insufficient evidence to support his jury conviction for conspiracy to commit mail and wire fraud in furtherance of the scheme to defraud the worker's compensation carriers.[7]

[6]Neither party raises any issue of a violation of the Sixth Amendment or any issue under United States v. Booker, 125 S. Ct. 738 (2005). Instead, the defendants do not challenge their sentences at all, and the government challenges only the downward departures.

[7]Count I of the indictment charged the defendants with conspiracy to commit both mail and wire fraud. The district court instructed the jury that they must unanimously agree on what substantive offense or offenses that the defendants conspired to commit but that the government was not required to prove both substantive offenses. The jury returned a general verdict finding the defendants guilty of "Count I — Alleged Conspiracy." Because the verdict was not limited to conspiracy to commit only mail fraud or only wire fraud, the implication from the general verdict form is that the jury found the defendants guilty of the conspiracy as charged in the indictment. However, the "Judgment" entered by the district court described the nature of the offense in Count I as "Conspiracy to Commit Wire Fraud" and does not mention mail fraud. We need not resolve any inconsistency between the indictment/general verdict documents and the Judgment

13

For a defendant to be convicted of a conspiracy, the government must demonstrate, beyond a reasonable doubt: "(1) an agreement among two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement." United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003), cert. denied, 541 U.S. 1056, 124 S. Ct. 2195 (2004). An agreement may "be proved by circumstantial as well as direct evidence." United States v. Hernandez, 921 F.2d 1569, 1575 (11th Cir. 1991) (quotation marks and citation omitted). It may be based upon the reasonable inferences from the relationship of the parties, their overt acts and concert of action, and from the totality of their conduct. United States v. Guerra, 293 F.3d 1279, 1285 (11th Cir. 2002), cert. denied, 537 U.S. 1141, 123 S. Ct. 934 (2003).

To prove wire or mail fraud, the government must show that the defendant (1) intentionally participated in a scheme or artifice to defraud, and (2) used the United States mails or an interstate wire to further that scheme or artifice. See Hasson, 333 F.3d at 1270 (wire fraud); United States v. Waymer, 55 F.3d 564, 568 (11th Cir. 1995) (mail fraud).

---

document as it is not material to any issues before this Court on appeal.

14

To reverse a jury verdict based on the insufficiency of the evidence, the defendant must show that a reasonable trier of fact could not find the defendant guilty of the offense beyond a reasonable doubt. United States v. Vera, 701 F.2d 1349, 1356-57 (11th Cir. 1983). In evaluating such a claim, the record is viewed in the light most favorable to the jury verdict, drawing all reasonable inferences and resolving all questions of credibility in favor of the government. Id. The verdict is affirmed if a reasonable juror could conclude that the evidence establishes guilt beyond a reasonable doubt. See id at 1357. It is not necessary that the evidence exclude every reasonable hypothesis of innocence. Id. "A jury can choose among reasonable constructions of the evidence." Id. (quotation marks and citation omitted).

It is also not necessary for the government to show that Douglas knew every detail or all participants in the conspiracy. United States v. Pedrick, 181 F.3d 1264, 1272 (11th Cir. 1999). He is a member of the conspiracy if he "participates in some affirmative conduct designed to aid in the success of the venture with knowledge that h[is] actions would further the venture." Id. (citation omitted). In addition, a defendant may be convicted of conspiracy even though he joined the conspiracy later and played a minor role in it. United States v. Knowles, 66 F.3d 1146, 1155-57 (11th Cir. 1995).

15

After considerable record review, we conclude that there was ample evidence of Douglas Colwell's agreement to commit mail and wire fraud in furtherance of the scheme to defraud the worker's compensation carriers. For example, there was evidence that Douglas Colwell signed the draft of the Wildhorse insurance application which contained gross inaccuracies as to the number of employees and annual payroll and which falsely stated that Wildhorse had no employee exchange agreements. There was also evidence that he provided false information to Jim Adkins during an insurance investigation. In addition, there was evidence that Douglas Colwell provided false information to Tim Wilson during a pre-audit and took Wilson to see a property in an effort to corroborate the false information contained in the insurance application.

The evidence also showed that Douglas Colwell agreed to continue to work with Plemons after Plemons reminded him of the frauds which had been perpetuated. Although Douglas Colwell might not have been so sophisticated as to know all of the particulars of the conspiracy, and even though he needed to call Plemons to learn the details as to what misrepresentations were made on the insurance application prior to meeting with Wilson, the fact that he called Plemons

16

suggests, if anything, that he knew enough about the scheme to realize that he had to call Plemons to determine what should be disclosed to Wilson.[8]

While there may not have been any smoking guns, there was a substantial body of evidence from which a reasonable juror could find that Douglas Colwell participated in the conspiracy beyond a reasonable doubt.

**B.     The Challenged Evidentiary Ruling**

Both defendants argue that the district court erred when it precluded inquiry into the identities of the unnamed persons with whom Plemons and Smith had previously engaged in similar frauds.

A district court enjoys wide discretion in determining whether to admit or exclude evidence. Hamling v. United States, 418 U.S. 87, 108, 94 S. Ct. 2887, 2903 (1974). To challenge a verdict on an incorrect evidentiary ruling, a defendant must demonstrate that the objection was adequately preserved, that the district court abused its discretion in interpreting or applying the evidentiary rule, and that the error affected a substantial right. United States v. Stephens, 365 F.3d 967, 974 (11th Cir. 2004). Moreover, "a conviction will not be overturned on the basis of a violation of Rule 403 absent a clear abuse of discretion." United States

_____

[8]Douglas appears to argue that when he refused to sign the 941 form in December 1995, he withdrew from the conspiracy and that this somehow negated his earlier participation in it. Whether he withdrew has been disputed by the parties throughout these proceedings, but is of no moment for purposes of determining whether there was sufficient evidence that Douglas participated in the conspiracy in the first place for at least some period of time.

17

v. Cross, 928 F.2d 1030, 1051 (11th Cir. 1991) (citation omitted).  We readily conclude that the district court did not clearly abuse its discretion in relying on Rule 403 to exclude certain evidence related to separate frauds not involving the Colwells.

Federal Rule of Evidence 403 provides in pertinent part that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  In determining whether to admit evidence under Rule 403, a district court may consider the amount of time it would have taken the parties to present the evidence, how the evidence would affect the focus of the trial, and whether it would have "diverted the jury's attention from the real issue in the case."  United States v. Gilliard, 133 F.3d 809, 815-16 (11th Cir. 1998).

The district court did not clearly abuse its discretion for several reasons. First, the district court allowed the jury to know that Plemons and Smith were involved in prior insurance fraud.  However, the nature of the dealings between Plemons and Smith and their earlier clients had nothing to do with Plemons's and Smith's dealings with the Colwells.  Thus, the probative value of Plemons's and

18

Smith's separate frauds was extremely attenuated. Indeed, the prior acts evidence was not offered to show Plemons and Smith were aware of the fraud in this case but to show the Colwells were aware of the fraud in this case, even though the Colwells were undisputedly not involved in the prior fraud. Moreover, even assuming the Colwells could elicit testimony concerning Plemons's and Smith's ability to engage in fraud undetected by others, it only provides a weak inference, at best, that the Colwells were unaware of Plemons's and Smith's fraud in this case. Thus, the probative value of such evidence was rather unsubstantial.

Second, allowing this type of inquiry would undoubtedly protract an already lengthy trial and confuse the jury as the government and defense counsel put on competing witnesses as to Plemons's and Smith's prior frauds. Fuller inquiry into Plemons's and Smith's prior frauds would have resulted in a mini-trial about their prior frauds. Evidence about whether their prior clients knew about the frauds would have necessarily involved not only the identities of the clients but also more evidence about the nature of the prior transactions. Such a mini-trial may have confused jurors into believing that the mini-trial was the main event. Because any potential probative value of the evidence was substantially outweighed by the

19

dangers of confusion of the issues, misleading the jury, and undue delay, the district court did not clearly abuse its discretion.[9]

The Colwells rely heavily on United States v. Cohen, 888 F.2d 770 (11th Cir. 1989). The Colwells' case, however, is significantly different from Cohen in several respects. First, unlike the Cohen brothers, the jury that convicted the Colwells was fully aware that the Colwells' co-conspirators, Plemons and Smith, had committed prior fraudulent acts over an extended period of time.[10] The existence of the prior frauds by Plemons and Smith was elicited during direct examination by the government, and the district court permitted the defendants to

---

[9]Alternatively, even if we assume arguendo that the district court abused its discretion in this evidentiary ruling, the defendants have failed to show that the ruling affected their substantial rights. "[A]n erroneous evidentiary ruling is a basis for reversal only if the defendant can demonstrate that the error probably had a substantial influence on the jury's verdict." United States v. Stephens, 365 F.3d 967, 977 (11th Cir. 2004) (internal citation and punctuation omitted). The evidence that both defendants knew that insurance companies were being defrauded is supported by documentary evidence and substantial testimony from employees and insurance auditors and investigators. Moreover, Curtis Colwell's argument is belied by his position during sentencing that he relied on Plemons's and Smith's statements that if they were caught, they would face only civil liability.

[10]In Cohen, Jerry Faw, the Cohen brothers' co-conspirator, testified that the Cohen brothers agreed to purchase a financially distressed company on condition that they could "steal a little" from the company, and that they subsequently did so through an arrangement whereby service providers overcharged the company in exchange for kick-backs which were shared among Faw and the Cohen brothers. Cohen, 888 F.2d at 772-73. During cross-examination, the defendants sought to question Faw about a prior business arrangement involving cash sales which was perpetuated by Faw without the knowledge of the company's previous president. The district court precluded the evidence on grounds that it was outside the scope of direct examination and irrelevant. Reversing, this Court, noting that the evidence was "crucial to the defense" theory that Faw was capable of concocting and managing a fraudulent scheme without the Cohen brothers' participation, and that Faw was "an essential government witness," concluded that the evidence was relevant to the issue of the Cohen brothers' guilt and that its exclusion deprived them of a fair trial. Id. at 776-77.

20

confirm that the prior fraudulent activities that Plemons and Smith admitted to involved the same sort of activity at issue in this case.

Second, unlike co-conspirator Faw in <u>Cohen</u>, Plemons and Smith, as co-conspirators, were not the essential link in establishing the Colwells' participation in the fraudulent scheme. Whereas Faw in <u>Cohen</u> testified that he received the kickbacks and passed a share on to the Cohen brothers, here the economic benefits of the fraud inured directly to the Colwells in the form of lower insurance premiums.[11] Third, unlike the <u>Cohen</u> case, the Colwells were not accused of starting the scheme at issue. It is uncontroverted that Plemons and Smith engaged in similar conduct in the past and had the wherewithal to do so again. Thus, nothing in <u>Cohen</u> shows that the district court abused its discretion in its evidentiary ruling in this case.

### III. CONCLUSION

For the foregoing reasons, we affirm the convictions of defendants Curtis and Douglas Colwell, and affirm both defendants' sentences.

**AFFIRMED.**

---

[11]We also note that the Colwells' theory — that unknown to the Colwells, Plemons and Smith <u>surreptitiously</u> reduced their clients' insurance premiums, clearly lacks merit.