UNITED STATES of America, Plaintiff-Appellee,

v.

Hugo SARMIENTO, Thomas K. Fahey, Alfonso Irribarren, Defendants-Appellants.

No. 82–5705.

United States Court of Appeals, Eleventh Circuit.

Oct. 18, 1984.

Rehearing Denied Feb. 5, 1985.

* Honorable Walter E. Hoffman, U.S. District Judge for the Eastern District of Virginia, sitting by designation.

Michael H. Tarkoff, Flynn, Rubio & Tarkoff, Miami, Fla., for Sarmiento.

Joel N. Rosenthal, Miami, Fla., for Fahey.

Michael Von Zamft, Hialeah, Fla., for Irribarren.

Robert Dunlap, Asst. U.S. Atty., Stanley Marcus, U.S. Atty., Linda Collins Hertz, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee.

Before TJOFLAT and CLARK, Circuit Judges, and GOLDBERG *, Senior Circuit Judge.

---

* Honorable Irving L. Goldberg, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. Fahey was acquitted on the first two counts and was convicted of the third count—removing the cocaine from Customs custody.

TJOFLAT, Circuit Judge:

Hugo Sarmiento, Alfonso Irribarren and Thomas Kevin Fahey appeal their convictions for: (1) conspiring to possess, (2) possessing with intent to distribute, and (3) removing from U.S. Customs Service custody a quantity of cocaine secreted in a packing crate.[1] Appellants question the sufficiency of the evidence and several trial rulings of the district judge. We conclude that the government proved the crimes charged and that no reversible error occurred. Accordingly, we affirm.

I.

At 6:00 a.m. on Friday, February 19, 1982, a gray wooden crate approximately two feet by two feet by three feet marked "Boeing aircraft partr" [sic] arrived at Miami International Airport on Faucette Airlines flight # 280 from Lima, Peru. The crate was sealed with twelve screws and two steel bands; the gray paint had been applied over the tightened screws. The crate was not listed on the airplane's manifest and contained no documentation indicating whether it was part of the airplane's flight kit or cargo, and if the latter, who had sent it and who was to receive it.

The plane and its contents, having arrived from a narcotics source country, Peru, were inspected by U.S. Customs Service officials. Customs Inspector Draun cut the steel bands surrounding the crate. Customs Inspector Knapik unscrewed the top and inspected the contents. Inside he found twenty-six packages, each weighing one kilogram, of grayish-white powder that field tested positive for cocaine. Inspector Knapik resealed the crate, left the airplane and informed his superiors. Employees of Servair, a bonded Customs warehouse, proceeded to unload the crate as well as other cargo from the plane and move it on a wooden pallet into the Servair warehouse.[2]

2. Servair occupied one of a series of small warehouses in a single large building at Miami International Airport. The individual warehouses were separated by a chain link fence from floor to ceiling. Each had a roll-up corrugated steel door which opened onto a loading dock.

In February 1982 Servair handled the freight of three airlines, Challenge, Capital and Fau-

The Customs Service and the Drug Enforcement Administration (DEA) decided to conduct a surveillance of the crate. A team of Customs agents from the Tactical Enforcement Support Team secreted themselves in the adjacent warehouse and established a twenty-four hour a day watch over the gray crate for the next five days. During the course of this surveillance the agents noted who had contact with the crate and what that contact was.[3]

Later on the morning of the nineteenth, the manager of the Servair warehouse, appellant Sarmiento, arrived and opened the warehouse. At this time the gray crate, along with several other boxes from Faucette flight # 280, was resting on a pallet located in the middle of the building. Upon entering the building, Sarmiento went directly to the crate, bent down and began carefully examining it, running his hands over the crate as he did so.[4] Twenty minutes later Sarmiento came out of his office and examined the crate again.

Early that afternoon Sarmiento moved the pallet containing the crate and the other cargo from flight # 280 to a scale located in the warehouse. Sarmiento then weighed the pallet with its contents and examined the crate, once more running his hands over its surface. Sarmiento separated the crate from the other cargo, placing it on a pallet by itself. He then moved it to a different location than that designated for Faucette cargo.

Shortly thereafter, Joseph Mangin and Brent McFarlan arrived at Servair in a blue BMW driven by McFarlan. Mangin and McFarlan entered the warehouse and met briefly with Sarmiento. After they left, Sarmiento once more moved the crate, this time to the area designated for Faucette freight, and placed several other boxes on

the same pallet with the crate. At about 5:00 p.m., Sarmiento and all the other Servair employees closed the warehouse and left for the day. At 10:00 that night, Customs inspectors entered the warehouse, opened the crate, and replaced all but one of the packages of cocaine base with packages of inert material. Nothing further of note was observed by the agents at the warehouse over the weekend.

At 8:30 on Monday morning Sarmiento opened the warehouse and went directly to the crate and examined it. At 10:30 a.m. he placed an additional box on the pallet with the crate. At 2:00 that afternoon Mangin and McFarlan returned to the warehouse in the same blue BMW once more driven by McFarlan. This time, however, only Mangin entered the warehouse, while McFarlan remained behind in the car. At 2:05 p.m., appellant Irribarren arrived, at which time he and McFarlan entered the warehouse together. McFarlan, Irribarren and Mangin then briefly conversed near the warehouse door.

Mangin and Irribarren had each been consignees on packages of furniture that had been shipped from Peru on Faucette Airlines one week earlier. Customs agents had closely examined the furniture on its arrival and had drilled holes into some of the pieces. Furniture is a commonly used hiding place for drug shipments. This shipment, having originated in Peru, aroused the suspicion of Customs officials. A further determination, that the addresses listed for Irribarren and Mangin were nonexistent, led them to closely examine the furniture. However, no contraband was discovered in the furniture.

Shortly after 2:00 p.m. on February 22, 1982, two Customs inspectors arrived at the warehouse and with the help of Mangin

---

cette. The items handled by Servair for Faucette were exclusively imported cargo. Servair was under an obligation to make sure that all imported cargo was cleared by Customs before it was released to the consignees.

3. The facts recited in the text *infra* were established by the testimony of the government agents who conducted the surveillance of the

Servair warehouses and the defendants' activities.

4. The steel straps that had surrounded the crate were no longer present, but indentations they had made were discernable. The process of unscrewing and screwing the top back onto the crate had resulted in scratches to the fresh paint.

and Irribarren proceeded to remove the cardboard wrapping that covered the two furniture shipments. After the Customs inspectors left the warehouse Sarmiento displayed the crate to Mangin, Irribarren, and McFarlan, rotating it in front of them and pointing out features on the surface of the crate. The four men then began placing the furniture consigned to Mangin and Irribarren, and the cardboard wrapping which had initially covered the furniture, on the pallet with the crate, and over the crate itself. After completing this task they left the warehouse.

The following day Sarmiento opened the warehouse and once more checked the crate. At 9:00 a.m. Irribarren arrived in a car rented to Brent McFarlan's wife, Leah. He removed the cardboard covering the crate and unscrewed two screws from the crate. He then replaced the cardboard over the crate and left the warehouse.

At 1:30 p.m. Irribarren returned to the warehouse and, after conferring with Sarmiento, departed at about 2:00 p.m. He drove to a lunch truck parked several blocks away. There, he got out of his car, walked over to a blue BMW parked nearby and conversed with the driver. Shortly after, Mangin and McFarlan arrived at the Servair warehouse in a blue BMW. Mangin entered the warehouse, leaving McFarlan behind the wheel of the car.

Appellant Fahey then arrived in a white panel truck and entered the warehouse carrying four or five "moving blankets" which he dropped on the floor near the scale. He walked over to Sarmiento and Mangin who were conversing near the crate. After speaking with Sarmiento and Mangin, Fahey picked up one of the moving blankets, returned to the crate, and covered it with the blanket. Mangin and Fahey then loaded the crate and the furniture into the white panel truck.

Mangin and McFarlan left the warehouse in the blue BMW and moments later Fahey drove off in the truck, leaving behind the moving blankets on the floor of the warehouse. Fahey was followed by a string of cars containing Customs and DEA agents. He drove away from the warehouse for about thirty minutes and then, retracing his route, returned to the warehouse and parked the truck. When approached by Customs and DEA agents with drawn guns, he stated "you got me." Meanwhile Sarmiento was arrested at the warehouse and Irribarren was arrested at the lunch truck. When arrested, Irribarren remarked, "but you didn't catch me with anything." Mangin and McFarlan surrendered to law enforcement officials at a later date.

## II.

Appellants Hugo Sarmiento, Alfonso Irribarren, and Thomas Kevin Fahey, and Joseph Mangin, Brent McFarlan, and Victor Marin[5] were indicted on March 4, 1982, in the Southern District of Florida. The indictment contained four counts. All six defendants were charged with: (1) conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. §§ 846, 841(a)(1) (1982);[6] (2) possession of cocaine with intent to distribute, in violation of 21

---

**5.** Victor Marin was an export clerk with Faucette Airlines during this time period. Although we have not discussed him in Part I *supra,* he too was present during some of the activities surrounding the crate.

**6.** 21 U.S.C. § 846 (1982) provides:

§ 846. **Attempt and conspiracy**

Any person who attempts or conspires to commit any offense defined in [18 U.S.C. §§ 801–904; Drug Abuse Prevention and Control, Control and Enforcement] is punishable by imprisonment or fine or both which may

not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C. § 841(a)(1) (1982) provides:

§ 841. **Prohibited Acts A**

(a) Unlawful Acts

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

U.S.C. § 841(a)(1), 18 U.S.C. § 2 (1982);[7] (3) conspiracy to import cocaine, in violation of 21 U.S.C. §§ 963, 952 (1982);[8] and (4) theft from Customs custody, in violation of 18 U.S.C. §§ 549, 2 (1982).[9]

A jury trial commenced on April 27, 1982. On May 5, 1982, the government rested and all six defendants moved for a judgment of acquittal. The district court entered a judgment of acquittal on all counts as to Victor Marin, and on count three as to the remaining defendants. Count four was then renumbered count three. On May 6, the jury returned verdicts of guilty on all counts against Sarmiento, McFarlan, Mangin, and Irribarren, guilty against Fahey on count three, and not guilty against Fahey on counts one and two. All the defendants appealed their convictions. McFarlan was declared a fugitive on July 30, 1982, and his bond was estreated. We subsequently dismissed his appeal. Mangin's bond was revoked on January 26, 1984, and he too is a fugitive from justice. On the government's motion, received shortly before oral argument, we dismissed his appeal. *See Estrada v. United States*, 585 F.2d 742 (5th Cir.1978).[10]

The three appellants remaining raise four issues on appeal. First, they raise the issue of the sufficiency of the evidence, each claiming that the evidence even taken in a light most favorable to the government was insufficient to convict him. Second, all the appellants claim that the trial court erred in refusing to grant their motions for a mistrial made during the government's closing argument to the jury, when the prosecutor commented on facts not in evidence and expressed his personal opinion as to the credibility of the witnesses. Third, all the appellants claim that the trial court erred in failing to grant them a mistrial or, in the alternative, surrebuttal when the prosecutor, in his rebuttal, offered new theories concerning appellants' criminal liability and exceeded the bounds of the defendants' closing argument. Fourth, Fahey claims that the court abused its discretion in failing to grant a jury view of the Servair warehouse and thereby prevented the jury from making a reasonable determination on the issue of whether Fahey knew he was taking the crate from Customs custody. We will address each of these claims in turn.

## III.

### A.

■ The first claim we address is the sufficiency of the evidence. This court must decide whether, viewing the evidence in the light most favorable to the government, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt as to each appellant. *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir.1983); *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). All reasonable inferences from the evidence must be drawn in favor of the jury's verdict. *United States v.*

---

**7.** For the text of 21 U.S.C. § 841(a)(1) (1982), see *supra* note 6.

18 U.S.C. § 2 (1982) provides:
**§ 2 Principals**
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States is punishable as a principal.

**8.** Because all the defendants were found not guilty of importing the cocaine, see text *infra,* we do not discuss this count or provide the text of the criminal statute involved.

**9.** 18 U.S.C. § 549 (1982) provides in pertinent part:
**§ 549. Removing goods from customs custody; breaking seals**
\* \* \* \* \* \*
Whoever ... unlawfully removes any merchandise in [a] bonded warehouse or otherwise in customs custody or control; ...
Shall be fined not more than $5,000 or imprisoned not more than two years, or both.
For the text of 18 U.S.C. § 2 (1982) see *supra* note 7.

**10.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*Johnson,* 713 F.2d 654, 661 (11th Cir.1983). A reversal is in order only if "the evidence, viewed in the light most favorable to the Government, is such that a reasonably minded jury *must* have a reasonable doubt as to the existence of the essential elements of the crime charged." *United States v. Barrera,* 547 F.2d 1250, 1255 (5th Cir.1977) (emphasis in original). The government need not prove that the facts of the case are inconsistent with the defense's theory of the case. The jury is free to choose among alternative reasonable constructions of the evidence. *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (*en banc*), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

"To support a conviction of conspiracy, the government must prove that an agreement existed between two or more persons to commit a crime and that the defendant knowingly and voluntarily joined or participated in the conspiracy." *Vera,* 701 F.2d at 1357. For the government to prevail on a charge of possessing, the possession need not be actual, but may be constructive; nor need it be exclusive, it may be shared. *United States v. Marx,* 635 F.2d 436, 440 (5th Cir. Unit B 1981). Intent to distribute may be inferred from the amount of cocaine involved. *United States v. Grayson,* 625 F.2d 66, 67 (5th Cir.1980).

■ In order to support a conviction for removing goods from Customs custody, the government need not prove knowledge that the goods are in Customs' custody. The intent element of this offense is satisfied by proof that the defendant intended to commit a felony. *United States v. Harold,* 588 F.2d 1136, 1142 (5th Cir.1979); *see also, Hughes v. United States,* 338 F.2d 651 (1st Cir.1964) ("larcenous intent—knowledge of a wrongful act" satisfies the intent requirement under 18 U.S.C. § 549).

### 1. Sarmiento

■ The first sufficiency of the evidence claim we address is that of Hugo Sarmiento. Sarmiento contends that his actions with respect to the crate were consistent with his role as manager of the Servair warehouse. If that were true, we would be compelled, given the circumstances of this case, to find that there was insufficient evidence to convict him. It is precisely because his duties with respect to the crate are relatively clear and his action with respect to it so anomalous that we find no difficulty in finding that the evidence was sufficient to support a conviction.

Customs and DEA agents testified to the facts we have presented in part I *supra.* All of the evidence against Sarmiento was circumstantial. The government did not have recordings or other evidence establishing conclusively that Sarmiento knew what was in the crate. Nevertheless, Sarmiento's behavior with respect to the crate was not consistent with an innocent performance of his duties. He repeatedly examined the crate and moved it around the warehouse. He displayed it to Mangin, Irribarren, and McFarlan. He helped those three cover and conceal the crate. He made no effort to inform responsible authorities about the crate. Finally, although it was his duty to retain all imported cargo until it had been cleared by Customs, he was present when a thoroughly undocumented crate was removed from the warehouse by Mangin and Fahey, thereby giving his tacit approval. These acts and omissions are totally at odds with his duties as manager of the warehouse. We conclude that the evidence was more than sufficient for a jury to conclude beyond a reasonable doubt that Sarmiento was guilty of conspiracy to possess, possession of, and removing cocaine from Customs custody.

### 2. Alfonso Irribarren

■ The convictions of Irribarren for conspiracy, possession, and removing from Customs custody all hang by the same threads. That all these threads are circumstantial does not diminish their strength and ability to support these convictions.

Alfonso Irribarren was driving a car rented by Leah McFarlan. He was seen talking to the occupants of a blue BMW shortly before the blue BMW occupied by

Mangin and McFarlan arrived at the warehouse to remove the crate in question. He, along with Mangin and McFarlan, was present when Sarmiento displayed the crate. He participated in concealing the crate with the cardboard that had been wrapped around his and Mangin's furniture. Most damaging, he examined the crate closely and removed two screws from the lid. Finally when he was arrested, he complained to the officer, "but you didn't catch me with anything." There can be little, if any, doubt that Irribarren was intimately entwined in the conspiracy to possess this crate of cocaine and that he was guilty of all three offenses.

### 3. Thomas Kevin Fahey

■ Fahey's claim is clearly the most substantial. The evidence against him was more limited. He arrived at the warehouse in a white panel truck. He entered the warehouse with a bunch of moving blankets. With the help of, and apparently at the direction of, Joseph Mangin, he covered the crate with a blanket and placed it in the truck, and then loaded the furniture in the truck. He departed the warehouse, leaving several moving blankets on the floor. He drove about for half an hour, turned around, and came back.

Up until that time, though Fahey's behavior was both suspicious and peculiar, it was also fully consistent with the hypothesis that he was simply an innocent truck driver who merely followed his instructions until he realized he was lost and then returned to his starting point. If the evidence were to end on this note, we would be compelled to reverse Fahey's conviction for removing cocaine from Customs custody. The evidence, though, contains one more highly damaging item. When he was arrested by federal agents on his return to the warehouse, Fahey said, "You got me." This was a tacit admission of guilt and gave added weight to Fahey's suspicious movements at the warehouse, and particularly thereafter. Under the circumstances

it implies that he was aware of the contents of the crate. Therefore, we find that there was sufficient evidence for the jury to find that Fahey feloniously removed the crate from Customs custody.

### B.

■ All the appellants in effect ask this court to grant the mistrial that the district court refused to grant during the government's closing argument to the jury, on the grounds that the prosecutor improperly commented on facts not in evidence, expressed opinions on the credibility of government witnesses, and made prejudicial remarks to the jury. Although we agree with the appellants that the prosecutor's closing did contain improper remarks, nonetheless we find that those remarks were inadvertent rather than malicious, that they were not substantially prejudicial, and that any lingering prejudice was cured by the court's instruction to the jury.

The remarks the prosecutor made to the jury were as follows:

> The man [Customs Agent Ahern] stood up, told the truth, told it as best he knew it.[11]

\* \* \* \* \* \*

> What you have seen here during the course of this entire trial is the best efforts by people who are employed by the federal government, real people just like yourselves.

\* \* \* \* \* \*

> Inspector Ahern was up there for two days and I do not think there is anybody who could have done a better job. I really don't believe there is. The man testified truthfully, honestly and he did a fine job.

\* \* \* \* \* \*

> What you have to answer is whether or not Ahern is lying to you, and I do not believe he was.

\* \* \* \* \* \*

---

**11.** This remark was made during the prosecutor's initial argument to the jury. The remarks that follow in the text were all made during the prosecutor's rebuttal, after all the defendants had presented their arguments.

Did Joe Diaz lie to you? I don't think so.

\*     \*     \*     \*     \*     \*

[Joe Diaz] even came in and shook hands with him [Sarmiento] when he first walked in the courtroom.[12]

\*     \*     \*     \*     \*     \*

[Sarmiento] goes over, stands with them and they load it on there, walks them out to the truck ... [13]

\*     \*     \*     \*     \*     \*

[Defense counsel] talked for quite some time about the fact that the government did not call Agent Ramirez. I will tell you why the Government did not call him, simply because there was no need for the man to repeat exactly what Agent Ahern told you and if he was able to say it exactly as Agent Ahern did then there is something bogus ...

\*     \*     \*     \*     \*     \*

Now, I would venture to say that all of you get stuff in the mail every day and your name is misspelled. I always get stuff where my name is Niel instead of Neil, you get letters turned around.

\*     \*     \*     \*     \*     \*

[Reasonable doubt] is the feeling in here, it is the feeling in your gut. Close your eyes and ask yourselves, did these people know what was in that box and the answer to that that you get in your gut is, "yes, they did."

Defense counsel objected to these statements by the prosecutor. After several objections, the district judge conducted a sidebar conference, at which time he attempted to curb these improper remarks by the prosecutor. It is apparent from the transcript that the district judge was of the opinion that the prosecutor was simply not sufficiently cognizant of the proper form and scope of closing argument.

The trial court attempted to cure any prejudice to the defendants that resulted from the prosecutor's closing argument by giving the jury the following cautionary instruction at the conclusion of the parties' final summations:

> There were certain statements made by counsel, or several of them, I don't remember which, I think maybe one or two, "I believe that," "I believe that." This is merely an inadvertence, I am sure, because lawyers are not allowed to tell you about their personal beliefs. They are officers of the Court.
>
> Your beliefs, your findings of fact, better said, are what are important, and what is known about this case is what has been presented in this courtroom.
>
> There is no aura or background anywhere that anybody else is calling upon to express a personal belief. You understand what I am telling you.
>
> That is simply another way of saying the evidence disclosed that.
>
> It is too bad that every now and then we say, "I believe that," or, "In my judgment so and so."
>
> Lawyers are not supposed to be expressing personal opinions and nobody has meant to do so for any purpose.
>
> It simply comes out that way, because they are human beings and are arguing. I am sure that you all understood that.
>
> \*     \*     \*     \*     \*     \*
>
> You cannot be provided evidentiary material such as Mr. Taylor gets mail and his name is spelled wrong as to his first name. That is not evidence, so that is why we have a little difficulty in final argument.
>
> \*     \*     \*     \*     \*     \*
>
> I have given you a definition of what reasonable doubt is. It does not necessarily mean a gut feeling. There is nothing wrong with gut feelings but that does not meet the test that I have just outlined for you on reasonable doubt.

"Improper closing argument by a prosecutor necessitates a reversal of the convic-

---

**12.** This event occurred while the jury was sequestered in the jury room and thus was dehors the record.

**13.** The evidence did not reveal precisely what Sarmiento was doing when the truck was being loaded.

tion only if defendant's substantial rights are prejudiced." *United States v. Granville,* 716 F.2d 819, 821 (11th Cir.1983). In the case before us we have several forms of improper closing argument. The prosecutor vouched for the veracity of certain witnesses, referred to facts not in evidence, and in effect testified before the jury. Some of these improprieties were purely formal errors that could not possibly have affected any substantial rights of the defendants. For example, the prosecutor's gratuitous reference to the fact that he sometimes received mail that contained misspellings of his name, although improper, merely illustrated for the jury what they undoubtedly had personally experienced and observed countless times. We also note that the district court instructed the jury on this point, and that this argument referred to defendant McFarlan, who is no longer a party to this appeal.

The prosecutor's reference to Diaz shaking hands with Sarmiento, when Diaz entered the courtroom, was similarly harmless. Diaz had worked under Sarmiento at Servair and at the time of the trial had assumed his superior's position. Although Sarmiento's lawyer did attempt to attack Diaz' credibility by pointing out that if Sarmiento were found innocent he would resume his former position, the underlying purpose to be served by this attack has not been made clear. Diaz testified to little more than the normal working procedures of the warehouse. This testimony was not particularly damaging or surprising. The defense never offered any evidence which contradicted anything that Diaz said. The validity of his testimony was never brought into question. Therefore, the prosecutor's reference to Diaz shaking Sarmiento's hand did not infringe any substantial rights of Sarmiento's even if credited by the jury, in violation of the district court's instruction that they were to decide the case solely on the basis of the evidence produced before them.

The most egregious impropriety committed by the prosecutor was his repeated vouching for the credibility of the witnesses. The critical inquiry is whether the prosecutor's remarks might reasonably lead the jury to believe that there is other evidence not before the jury that convinced counsel of defendant's guilt. *United States v. Ellis,* 547 F.2d 863, 869 (5th Cir. 1977); *McMillian v. United States,* 363 F.2d 165, 169 (5th Cir.1966). On the other hand, "when the prosecutor voices a personal opinion but indicates this belief is based on evidence in the record, the comment does not require a new trial." *United States v. Granville,* 716 F.2d 819, 822 (11th Cir.1983).

The prosecutor's comments about the witnesses' credibility were neither obviously based on the evidence, nor did they clearly imply that there was other evidence, undisclosed to the jury, on which they were based. Although there were instances where the prosecutor referred to the demeanor of the witnesses, on the whole his vouching for the veracity of the witnesses was more in the nature of a pure plea to the jury than a reasoned argument. This court and the former Fifth Circuit have repeatedly condemned precisely the same sort of remarks in other cases. *See United States v. Kopituk,* 690 F.2d 1289, 1341 (11th Cir.1982); *United States v. Rodriguez,* 585 F.2d 1234, 1243–44 (5th Cir.1978), *cert. denied,* 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980); *United States v. Corona,* 551 F.2d 1386, 1389–91 (5th Cir.1977); *Gradsky v. United States,* 373 F.2d 706, 710–11 (5th Cir.1967). The only reason that we are not compelled to reverse the appellants' convictions is that the district court thoroughly and carefully instructed the jury on how to treat the prosecutor's remarks, thereby curing any prejudice. *See Gradsky,* 373 F.2d at 711. Although there may be instances where a jury instruction is incapable of curing the effect of a prosecutorial impropriety, such is not the case here. The district court succeeded in placing the prosecutor's improper gratuitous remarks in their proper context. Thus, we follow the general rule that a curative instruction by the trial court may, in some situations, cleanse a case of an otherwise reversible miscue by the prosecu-

tor, *Hanley v. United States*, 416 F.2d 1160, 1166 (5th Cir.1969) *cert. denied*, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970), and conclude that, although the prosecutor overstepped the bounds of proper argument, the careful jury instructions had the effect of purging the case of any prejudice.

### C.

Appellants' next claim, related to the last, is that the prosecutor's rebuttal argument went beyond the scope of the defendants' closing arguments. They claim that this was in violation of Fed.R.Crim.P. 29.-1.[14] Although we have said that "[t]he prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel," *United States v. Hiett*, 581 F.2d 1199, 1204 (5th Cir.1978), neither party has referred us to, and we cannot find, any controlling precedent that delineates with any precision the bounds of a "fair response."

The appellants complain that the prosecutor's rebuttal was improper in the following respects: (1) the prosecutor, in his initial argument to the jury, paid little attention to Irribarren's conduct at the warehouse; on rebuttal, however, he went into considerable detail and suggested that Irribarren attempted to disguise his handling of the crate out of fear of being observed; (2) the prosecutor, after having ignored the point in his initial argument, asserted that Sarmiento must have notified Mangin and Irribarren to come to the warehouse because the invoices had no telephone number, and incorrect addresses; (3) the prose-

cutor argued that the value of the cocaine was relevant to the issue of intent to distribute; (4) the prosecutor argued that Fahey returned to the warehouse in order to surrender to the police; (5) the prosecutor stated that Fahey's counsel had argued that Fahey had never said, "You got me"; (6) the prosecutor argued that Fahey had left the moving pads because he was in a hurry to leave the warehouse.

■ The right of the government to present a rebuttal argument is, of course, conditioned and limited by the defense's closing argument. *See* Fed.R.Crim.P. 29.1 *supra* note 14.[15] Those issues the defendants, collectively, raised in their closing arguments were fair game for the prosecution on rebuttal. The substance of the appellants' complaint, which they voiced to the district court in asking for the right of surrebuttal, is that it was only in the rebuttal phase of the prosecutor's argument that they heard, for the first time, the government's theory of the case. However, they can point us to no controlling precedent that it is their right to have every theory the government has about a defendant's guilt before proceeding with their summation. *But see United States v. Gleason*, 616 F.2d 2, 26 (2nd Cir.1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980) (surrebuttal may be required when prosecution presents a new theory on rebuttal).

A perusal of the closing arguments reveals initially that the government, in an address that covers ten pages of transcript,

---

**14.** Fed.R.Crim.P. 29.1, CLOSING ARGUMENT, provides: "After the closing of evidence the prosecution shall open the argument. The defense shall be permitted to reply. The prosecution shall then be permitted to reply in rebuttal."

**15.** Notes of Advisory Committee on Rules
[Rule 29.1] is designed to control the order of closing argument. It reflects the Advisory Committee's view that it is desirable to have a uniform federal practice. The rule is drafted in the view that fair and effective administration of justice is best served if the defendant knows the arguments actually made by the prosecution in behalf of conviction before the

defendant is faced with the decision whether to reply and what to reply.

\*     \*     \*     \*     \*     \*

Notes of Committee on the Judiciary, House Report No. 94–247.

\*     \*     \*     \*     \*     \*

**B. Committee Action....** Rule 29.1 does not specifically address itself to what happens if the prosecution waives its initial closing argument. The Committee is of the view that the prosecutor, when he waives his initial closing argument, also waives his rebuttal. [See the remarks of Senior United States Circuit Judge J. Edward Lumbard in Hearings II, at 207.]

recounted the evidence and invited the jury to make the reasonable inference that the defendants' intense interest in, and actions with regard to, the gray crate revealed a knowledge of its contents and the criminal intent that flowed from that knowledge. The defendants were each represented by separate attorneys. Their closing addresses span some 170 pages of transcript. The prosecutor's rebuttal to that covers approximately fifty-five pages of transcript. The defense counsel attempted to explain away the evidence against their clients by presenting alternative theories of what really transpired at the warehouse and by impugning the tactics and motives of the prosecution. All of the prosecution's rebuttal comments with respect to appellants were properly addressed to issues they raised.

The prosecutor's argument that Irribarren removed only two screws from the crate because he was afraid that he was being observed was made in response to defense counsel's argument that Irribarren's actions were inconsistent with the alleged criminal purpose. The prosecutor's argument that Sarmiento had probably been communicating with Irribarren and Mangin, for how else would they have known to go to the warehouse, was made in response to various defendants' assertions that they were strangers to the whole enterprise. The prosecutor's argument that the value of the cocaine was probative of the intent to distribute was in response to the defendants' assertion that evidence of the value was irrelevant and that the prosecution was trying to overwhelm and prejudice the jury with the large value of the cocaine. The prosecutor's arguments providing in greater detail a coherent explanation of Fahey's behavior was in response to Fahey's counsel's characterization of Fahey's actions as the innocent behavior of an ordinary truck driver.

In order to be entitled to rebuttal, the government is not required to present "a theory of the case" in its initial argument in the sense that it must endeavor to explain the meaning of every piece of evidence. In this case no sophisticated or complicated theory was required to convey to the jury the substance of the offenses charged and committed. The facts spoke for themselves. The government argued that the defendants were involved in a scheme to conceal cocaine in the gray crate, import it into the United States, remove it from Customs custody, and distribute it. The appellants were indicted and convicted because their contacts with the crate permitted an inference that they knew what was in the crate and were directing its movements. The government's strategy at closing argument was within the ambit of Fed.R.Crim.P. 29.1. Since no new issues were addressed in the prosecutor's rebuttal, no surrebuttal was required.

### D.

The final issue we address is Fahey's claim that the district court abused its discretion by denying his request for a jury view of the Servair warehouse. *Auto Owners Ins. Co. v. Bass*, 684 F.2d 764 (11th Cir.1982) (the granting of a jury view is within the discretion of the trial court). Fahey argues that a jury view was required in order to demonstrate to the jury that there was no designation of the Servair warehouse as a Customs facility. In this way Fahey sought to establish that he lacked the requisite information knowingly to remove the gray crate from Customs custody.

Fahey is either mistaken about what evidence was in dispute, or about what element of knowledge or intent was required for a conviction under 18 U.S.C. § 549 (1982), *see supra* note 9. There was no dispute at trial that there was no designation of Servair as a Customs warehouse. The offense of removing goods from Customs custody does not require knowledge that the goods are in Customs custody, only that the person removing the goods have a felonious intent. While that intent could be satisfied by proof of intent to remove from Customs custody, it is by no means necessary. To have granted a jury view would have likely confused the jury

and misled it into thinking that knowledge that the crate was in Customs custody was an element of the crime. The district court exercised its discretion appropriately in denying a jury view.

AFFIRMED.

CLARK, Circuit Judge, specially concurring:

I concur in the affirmance of the convictions and concur in all parts of the opinion except Part III–C, which holds that the government's rebuttal argument was proper under Fed.R.Crim.P. 29.1. I agree with the majority that the appellants were not entitled to surrebuttal argument, but my reason is based upon the district court's remedying the prosecutor's improper argument. Objection was made by the appellants to the prosecutor's argument on the ground that the argument was not in rebuttal, but was instead an opening argument. The trial court held a side-bar conference (Tr. at 1791–1800). The following are some samples of the district court's remarks about the prosecutor's argument:

THE COURT: The biggest point now that you [appellants] make and it is a good one, Mr. Taylor is in fact again waiting for rebuttal to make his primary argument, whether he knows it or not or whether he has done it for 20 years or not or whether other judges don't know it or not, that is what he is doing.

MR. TAYLOR: I do not understand it.

THE COURT: I know you do not understand. I well know you do not understand because you like to hold back and have the last shot because that is your operation.

Tr. at 1793.

\*    \*    \*    \*    \*    \*

THE COURT: Counselor, I understand that you are not intentionally doing that. This is something that you really, you really do not grasp.

Tr. at 1795.

THE COURT: You are going to go ahead, but I am telling you right now that I am not going to embarrass counsel by interrupting you, as long as you are arguing rebuttal, you get to argue it.

MR. TAYLOR: It would not be a fair—

THE COURT: When you get off of it and go into initial government argument which is not made on direct, I personally am going to stop you. All right?

MR. TAYLOR: All right.

Tr. at 1797.

Thereafter the court on a number of occasions had to interrupt the prosecutor to inform him that his argument was not within the ambit of the rule which permits only rebuttal in the government's closing argument.

Thus, I conclude that the appellants were not harmed because the district court responded to their objections and prevented the prosecutor from his numerous efforts to make an opening statement on rebuttal. I write this special concurrence so that government counsel is aware that affirmance, insofar as I am concerned, is not based upon a belief that the government was attempting to comply with Fed.R. Crim.P. 29.1, but instead is based on a belief that the trial court's constant attention to the argument preserved it from reversible error. The district court should not have been put to this task by the government. The rule is very clear and upon considering it, the House Judiciary Committee commented:

The Committee believes that … fair and effective administration of justice is best served if the defendant knows the arguments actually made by the prosecution in behalf of the conviction before the defendant is faced with the decision whether to reply and what to reply.

H.R.Rep. No. 94–247.

Believing that the evidence was sufficient to convict and that the defendants received a fair trial, I have no problem in joining the majority in the affirmance.