[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-15301
Non-Argument Calendar

_____

D.C. Docket No. 1:13-cr-20338-KMW-3

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TONYA WILLIAMS,
a.k.a. Tanya Williams,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 24, 2014)

Before TJOFLAT, WILLIAM PRYOR and MARTIN, Circuit Judges.

PER CURIAM:

Tonya Williams appeals her convictions for three counts of aggravated

identity theft. 18 U.S.C. §§ 2, 1028A(a)(1). Williams challenges the denial of her

motion for a mistrial; the exclusion of a criminal complaint under Federal Rule of Evidence 403; and the sufficiency of the evidence. We affirm.

Williams and her cohorts traveled from New York to Florida, where they received fraudulent credit cards and instructions from a Chinese man to purchase specific items in particular stores. For a couple of days, Williams and her cohorts used their fraudulent credit cards to buy goods from Louis Vuitton and Apple stores in Orlando, Boca Raton, and Dania Beach. Louis Vuitton tracked the purchases and notified its stores that three individuals could be using fraudulent credit cards. The notice contained a physical description of each individual.

Eric Enrique Alman, a security officer for the Saks Fifth Avenue store in Miami with a Louis Vuitton boutique, noticed Williams and her cohorts enter the store because they matched the individuals described in the notice. Alman watched Williams walk to the register and present a SunTrust credit card with an account number ending in 4075. Alman entered the account number in a credit card identification system and learned that the account number was issued by BB&T Bank. After the SunTrust card was declined for exceeding the purchase limit, Williams presented for payment a Capital Bank credit card with an account number ending in 2575. Alman also checked that account number and learned that it was issued by HSBC Bank. The Capital Bank card also was declined for

2

exceeding the purchase limit, and Williams attempted, without success, to make a smaller purchase using the SunTrust card.

Alman approached Williams and asked to speak with her about counterfeit credit cards, and Williams agreed to accompany Alman to the security office. Inside the office, Williams relinquished several credit cards, including the cards ending in account numbers 4075 and 2575 and a third card with an account number ending in 8454, which she had used to purchase a laptop computer at a nearby Apple store. Later that day, a salesman at the Apple store identified Williams from a photo array and recounted Williams's story about buying the computer for her brother.

Jeremy Joseph, an agent of the United States Secret Service, interviewed Williams twice. In the security office, Williams told Joseph about her role in the fraudulent credit card scheme, traveling to Florida, and using passport photographs to create false identification documents. Williams was arrested and transported to the police station, where she admitted to Joseph that she had not applied for the fraudulent credit cards and that she knew the account numbers were stolen, but "she did not know specifically who they belonged to." And Williams provided a written statement acknowledging that she "[did not] know whose account numbers were on the fake cards" and that she "had no knowledge where they got the stolen numbers from." Joseph explained to Williams that a credit card would not work

3

unless it was encoded with a real account number belonging to a bank-approved account as opposed to a random series of made-up numbers, and Williams said that she understood.

At trial, a cardholder and two bank officials testified that Williams had used fraudulent credit cards that were imprinted and encoded with account numbers that banks had assigned to real persons. Patty Joe Blankenship testified that she had a Chase Bank credit card with an account number ending in 8454; she had not given Williams permission to use the account number; and she had not made a $1,603.93 purchase at the Apple Store in Miami, Florida. Nancy Weeden, an operations employee at BB&T Bank, and Ramon Gabriel Casanova, a manager at HSBC Bank, testified that applicants for debit and credit accounts had to submit identification documents, which the banks verified before assigning account numbers. Weeden testified that Williams did not open an account with BB&T; BB&T issued a debit card account number ending in 4075 to Pavel Levshyn under a business account for S&P Construction; and that account number had been imprinted on Williams's fraudulent SunTrust credit card. Casanova testified that HSBC issued a credit account number ending in 2575 to Yan C. Yeung; that account number had been imprinted on Williams's fraudulent Capital One card; and that account number had been used to make a purchase at an Apple store and twice had been declined at Saks Fifth Avenue. Casanova also testified on cross-

4

examination that a business could obtain a credit account number and have individual users approved on the account; credit reporting agencies used information on the account to create a credit profile for the users; and the credit profile could be used to obtain additional credit cards.

Agent Joseph testified about his conversations with Williams and his experience as a fraud investigator. When questioned on cross-examination if "credit cards in a fraudulent transaction . . . have to belong to . . . a real person," Joseph responded, "[f]or an account to be authorized and a transaction to be complete, the account number needs to be a real account number" and "[i]t needs to belong to a person or a business . . . ." Williams asked Joseph if an account number could be assigned to a "fictitious identity," and he answered, "[f]or a completely fictitious card to be created that would also contain a real account number . . ., [the issuing bank would have] failed to establish that it was a false Social Security number, a false individual, or a false business[.]" And Joseph explained that, "to [his] knowledge, in [his] training and experience, [he] [had] never come across a card that was fictitious in that the account number was issued to not a real person or business."

Williams asked Joseph whether he knew of a criminal complaint filed in New Jersey that charged fraudsters with obtaining credit accounts "in large part, by creating what is called synthetic identities, identities of people who do not exist,"

5

and after Joseph responded negatively, Williams moved to admit a copy of the complaint into evidence. Williams sought to admit the complaint, which she referred to as the Qureshi complaint, to substantiate her argument that she did not know that the account numbers on her fraudulent credit cards belonged to real persons. Williams argued that the complaint was an "adopted admission by the Department of Justice . . . [that] credit card numbers that belong to the accounts do not necessarily have to belong to a real person," which established that the Department had "taken the opposite view" from its position in Williams's case that "there is only one way to obtain a credit card number, and that is by a real person." The prosecutor objected and argued that the complaint was inadmissible hearsay; irrelevant; and misleading because "someone's real identity" was used to "generate some of the information that led to the synthetic identities."

The district court excluded the complaint from evidence, but allowed Williams to question Joseph about his "background and training" and his knowledge of "the Secret Service pursuing synthetic identities." Williams questioned Joseph about his training in "different kinds of fraud" and whether "it [was] possible for a criminal organization to make up a false identity by creating fraudulent identification documents and a fraudulent credit profile," and Joseph responded that he had not encountered that type of fraud. Joseph also testified that he was "not familiar" with people committing fraud by manufacturing false

6

identities or by "pump[ing] up" the creditworthiness of a fictitious identity. Joseph acknowledged that fraudsters could create false identities by "mak[ing] [up] false tax returns and identification documents," but Williams made "clear[] that's not what happened in this case." And Joseph agreed with Williams that the "credit card numbers . . . [in her case] came from people, real people."

Williams objected to the closing arguments of the prosecution and moved for relief before and after the jury returned its verdict. Williams moved for a judgment of acquittal and argued that the government had not proved that she knew the credit account numbers belonged to a real person. Williams also moved for a mistrial on the ground that the government had taken a position directly contrary to that in another case. Later, Williams moved for a new trial and argued that the Qureshi complaint should have been admitted into evidence.

The district court did not abuse its discretion by denying Williams's motion for a mistrial based on prosecutorial misconduct. Williams argues that the government presented false testimony from Agent Joseph and misled the jury by stating in its closing arguments that it was impossible for a fictitious person to obtain a credit card, but Williams misrepresents the record. Joseph testified on cross-examination that he was not familiar with the use of fictitious identities to commit credit card fraud. Williams fails to explain how Joseph's testimony about his personal experience with credit card fraud was false or required correction by

7

the prosecutor. *See United States v. McNair*, 605 F.3d 1152, 1208 (11th Cir. 2010). And the prosecutor was entitled to argue in closing that Williams's theory of defense that "a person could pick a name . .. out of the sky" and obtain a credit account was irreconcilable with the bank officials' testimony about the usual method of obtaining credit cards and Williams's statements to Joseph that she knew the accounts numbers were stolen, but "did not know specifically who they belonged to." *See United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997). After Williams argued that she could have been referring to a bank or a business when she told Joseph that she did not "know whose account numbers were on the fake card," the prosecutor fairly responded that Williams knew from ordinary human experience that "people, not businesses," had to prove their identities to obtain a credit account. *See United States v. Sarmiento*, 744 F.2d 755, 765 (11th Cir. 1984). No prosecutorial misconduct occurred.

The district court also did not violate Williams's right to a fair trial under the Fifth and Sixth Amendments by refusing to admit the Qureshi complaint into evidence. Even if we were to assume that the Qureshi complaint was relevant to Williams's defense, its probative value was outweighed by the likelihood that it would confuse the jury or waste its time evaluating a complicated scheme that was dissimilar to the one in which Williams was involved. *See* Fed. R. Evid. 403. The complaint, which charged that fraudsters obtained credit account numbers using

false identities, would have distracted the jury from deciding whether Williams knew the account numbers on her fraudulent credit cards belonged to real persons. And the value of the complaint was further diminished by the lack of any evidence that Williams knew of a scheme like the one described in the Qureshi complaint. The district court properly excluded the complaint from evidence.

Even if we were to assume that the district court erred by refusing to admit the complaint, any error was harmless beyond a reasonable doubt in the light of the substantial evidence of Williams's guilt. A defendant commits aggravated identity theft when she "knowingly . . . possesses[] or uses, without lawful authority, a means of identification of another person," 18 U.S.C. § 1028A(a)(1), which includes a "number that may be used, alone or in conjunction with any other information, to identify a specific individual," *id.* § 1028(d)(7). Testimony from security officer Alman, Agent Joseph, cardholder Blankenship, and bank officers Weeden and Casanova proved that Williams unlawfully acquired and used credit account numbers assigned to three specific individuals. And a jury reasonably could have found that Williams knew the account numbers belonged to real persons based on her repeated and successful use of those account numbers and her statements to Joseph that she knew the account numbers were "stolen," but she "did not know specifically who they belonged to." *See United States v. Doe*, 661 F.3d 550, 562–64 (11th Cir. 2011); *United States v. Gomez-Castro*, 605 F.3d 1245,

1249 (11th Cir. 2010). Williams argues that she was wrongfully convicted of stealing a credit account that belonged to a business, S&P Construction, but the account number was assigned to and uniquely identified a specific individual, Levshyn. *See* 18 U.S.C. § 1028(d)(7); *United States v. Auguste*, 392 F.3d 1266, 1268 (11th Cir. 2004). That the account number was attached to a business account did not prevent that number from serving as a "means of identification" for Levshyn.

We **AFFIRM** Williams's convictions.